## MUNICIPALITY OF PONCE *v.* ROMAN CATHOLIC APOSTOLIC CHURCH IN PORTO RICO.

### APPEAL FROM THE SUPREME COURT OF PORTO RICO.

No. 143.   Argued March 3, 1908.—Decided June 1, 1908.

Under the organic act of Porto Rico, March 2, 1901, 31 Stat. 77, the legislative assembly has express authority to legislate regarding the jurisdiction and procedure of its courts, and it has been usual for Congress to
give such power to the legislatures of the Territories.

Such legislation was not contrary to the Constitution and was in conformity
with the power conferred by Congress upon the legislative assembly to
regulate the jurisdiction of the courts.

Since April 11, 1899, Porto Rico has been *de facto* and *de jure* American
territory, and its history and its legal and political institutions up to the
time of its annexation will be recognized by this court.

As to our insular possessions the Spanish law is no longer foreign law, and
the courts will take judicial notice thereof so far as it affects those possessions.

The act of legislative assembly of Porto Rico of March 10, 1904, conferring
jurisdiction on the Supreme Court of Porto Rico for the trial and adjudication of property claimed by the Roman Catholic Church was within
its legislative power.

The general prohibition in the act of July 30, 1886, 24 Stat. 170, against
territorial legislatures passing special laws does not apply where specific
permission is granted by the organic act of a particular Territory.

Because it gives a certain corporation a right to maintain an action, a law cannot be regarded as a special law granting an exclusive privilege where it confers equal rights upon the people and the municipalities affected by the right and interested in matters affected.

A dedication to a public or charitable use may exist, even where there is no specific corporate entity to take as grantee. *Werlein* v. *New Orleans,* 177 U. S. 390.

The Roman Catholic Church has been recognized as possessing legal personality by the treaty of Paris with Spain of 1898 and its property rights solemnly safeguarded. In so doing the treaty followed the recognized rule of international law which would have protected the property of the church in Porto Rico subsequent to the cession. The juristic personality of the Roman Catholic Church and its ownership of property was formally recognized by the concordats between Spain and the papacy and by the Spanish laws from the beginning of settlements in the Indies. Such recognition has also been accorded the church by all systems of European law from the fourth century of the Christian era.

The fact that a municipality in Porto Rico furnished some of the funds for building or repairing the churches cannot affect the title of the Roman Catholic Church, to whom such funds were thus irrevocably donated and by whom these temples were erected and dedicated to religious uses.

THIS suit was commenced by the Roman Catholic Church in Porto Rico through the Bishop of that diocese against the municipality of Ponce. The complaint fully set forth the facts by reason of which relief was demanded. A demurrer was interposed, which was overruled, and leave to answer granted, which defendant having failed to do, judgment was entered by default.

It appeared that the Roman Catholic Church had been for many years in the lawful and peaceful possession of two churches, or temples, one in Ponce and one in Playa, the port of Ponce, dedicated, consecrated to and always used by the Catholic Church for its worship.

The petition alleged, among other things, that "these temples or churches were built with the funds of the municipality within which they are situated, and since then they have been maintained by donations and alms from the parishioners; and with respect to them their possession by the Catholic Church runs for many years, counting from the time when the build-

ing of the same was completed. And none of the buildings
of those temples, since they were built, have been used for
any other purpose than Catholic worship."

In 1827, by reason of steps taken by the royal alcalde of
Ponce and by the then governor of the island, Don Simon de
la Torre, a board or commission having jurisdiction over the
repairing and conservation of churches advised the governor
that it was "in keeping with the decorum of a rich and Chris-
tian city like Ponce to have a temple which would show that
such conditions existed covered with an arched roof, and not
a roof of thatch," etc.

The petition describes with considerable minuteness of de-
tail the various steps taken to rebuild or repair this church
at Ponce. The last estimate for repairs was made in 1872.

It is evident from the record that the sums expended came
from several distinct sources—

(1) Funds voluntarily contributed by the parishioners; (2)
the funds of the "House of the King;" (3) an assessment made
in 1835–36; (4) moneys advanced by the municipality.

As to the church at Playa, it was erected in part, at least,
with funds donated by the parishioners and apparently on
private land.

Whether the funds subsequently used for repairs of either
or both of the temples were in part derived directly from the
municipality or merely taken by way of loan, was a matter
between the central government and the municipality, which
could not affect the title of the church under the then existing
relations between church and State.

The complaint then alleged:

"13. The city council of the city of Ponce has included in
the inventory of its property the parochial church, described
in the first allegation of the complaint, on the ground that
from time immemorial the said church has been included in
that inventory. We do not know the exact date on which
that inventory may have been made, but according to the in-
formation we have it only runs back a few years from this date.

"14. After the change of sovereignty the city council of Ponce attempted to record in the registry of property the possession of the said church, and the lot upon which the same is situated, but in view of the fact that this was contrary to the provisions of paragraph 2 of article 25 of the regulations for the application of the mortgage law, which excludes the inscription of public temples used for Catholic worship, the registrar of property of the district of Ponce refused to make the inscription, unless a decision be obtained from the secretary of justice to authorize the same, notwithstanding the prohibitive provisions of the regulations. The secretary of justice rendered the decision applied for, repealing, without being a legislative authority, the said article 25 of the regulations in its second paragraph."

The Supreme Court of Porto Rico rendered the following judgment at San Juan, Porto Rico, May 21, 1906:

"This cause having heretofore been regularly called for decision upon the demurrer filed by the defendant to the plaintiff's complaint, and the same having been duly considered and overruled, and leave granted the defendant to file an answer within the time prescribed by law, and the said defendant having failed to file such answer, and judgment by default having been duly rendered therein, all of which proceedings appear in the record of this court, it is accordingly now hereby ordered, adjudged and decreed that the plaintiff have judgment against the defendant as prayed for in the complaint, and that all adverse claims whatsoever of the defendant and of all persons claiming or to claim the property herein described, or any part thereof, under said defendant, are hereby ordered, adjudged and decreed to be invalid and groundless, null and void; and that the plaintiff be and hereby is declared, adjudged and decreed to be the sole, true and lawful owner of the houses and lands hereinafter described, as set forth in the complaint, and every part and parcel thereof, and that the title of the plaintiff thereto is adjudged and decreed to be quieted against any and all claims and demands

of the defendant; and the said defendant is hereby perpetually enjoined and estopped from setting up any claim or title whatever thereto, or to any part thereof.

"Said premises are bounded and described as follows:

" 'The first is a building constructed of brick and masonry, situated in the city of Ponce, on an area of sixty-five meters and eight centimeters wide, including the walk, the building measuring forty-eight meters long by twenty-four meters and sixty-seven centimeters wide; bounded on the north by the Plaza Principal; on the south by the Plaza de las Delicias; on the east by the fire department, which is situated on the same lot or yard as the church; on the west by the said Plaza Principal.

" 'The second is another building situated in the center of the Plaza de la Playa de Ponce; the superficial area whereof measures forty-two meters and twenty centimeters long, by nineteen meters and forty centimeters wide; including the walk, the building measuring eighteen meters and thirty centimeters long by sixteen meters and twenty centimeters wide. It is bounded on all four sides by the Plaza de la Playa.'

"The inscription of possession heretofore made in the registry of property at Ponce, concerning the above said properties, in favor of the defendant, the municipality of Ponce, is hereby cancelled and declared to be utterly null and void, and the proper endorsement must be made upon the said registry indicating the same.

"It is hereby further ordered, adjudged and decreed that the plaintiff do have and recover all costs of this suit, which are hereby taxed at $—— dollars, and that the defendant be ordered to pay the same within thirty days from this date.

"Thus we pronounce, command and sign."

The case was then appealed to this court, and the following errors assigned:

"First. That the Supreme Court of Porto Rico was without jurisdiction of the subject-matter in controversy.

"Second. That said court was without jurisdiction of the parties.

"Third. That the said court erred in overruling the general demurrer and the eleven special grounds of demurrer interposed by the defendant to the complaint filed in said cause.

"Fourth. That the said court erred in rendering judgment against defendant in said cause, upon the pleadings in said cause, and that the judgment is contrary to the law and the facts as stated in the pleadings in said cause.

"Fifth. That the court erred in entering judgment without taking evidence and proofs or setting the cause upon the docket for hearing.

"Sixth. That the said court erred in rendering judgment in favor of the plaintiff and against the defendant in said cause."

*Mr. Frederick L. Cornwell,* for appellant, submitted:

The act of the legislative assembly of Porto Rico, approved March 10, 1904, conferring original jurisdiction on the Supreme Court of Porto Rico is absolutely void, as being contrary to the Fourteenth Amendment to the Constitution of the United States. *Davidson* v. *New Orleans,* 96 U. S. 101; *Weimar* v. *Bunbury,* 30 Michigan, 214; *Robertson* v. *Baldwin,* 165 U. S. 281; *Wally's Heirs* v. *Kennedy,* 2 Yerg. (Tenn.) 554; *Guy et al.* v. *Hermance et al.,* 5 California, 73.

The act is void for the further reason that the legislative assembly had no power to enact a private or special law, such being contrary to the organic act establishing civil government in Porto Rico and contrary to the acts of Congress applicable to all Territories. 31 Stat. at Large, 77 (§ 14); 24 Stat. at Large, p. 170; *Martin* v. *Territory,* 8 Oklahoma, 41; *S. C.,* 48 Pac. Rep. 106.

The legislative assembly exceeded its power and authority when it attempted to alter, change, amend or augment the jurisdiction of the Supreme Court of Porto Rico, and the Supreme Court of Porto Rico was absolutely without the power

and authority to hear and adjudicate this case as a *nisi prius*
or trial court, and all the proceedings had by the Supreme
Court in this case are absolutely null and void. 31 Stat. at
Large, 77; *Perris* v. *Higley et al.*, 20 Wall. 375; *Territory* v.
*Ortiz*, 1 N. M. 5; Cooley on Constitutional Limitations (3d ed.),
p. 392.

The Supreme Court of Porto Rico was without jurisdiction
of the parties, because the Roman Catholic Church in Porto
Rico is neither a natural person nor a corporation, or if a cor-
poration then it has not complied with the laws so as to enable
it to sue and be sued in the courts of Porto Rico. The laws
of Porto Rico having specifically stated the terms under which
a foreign corporation may do business in Porto Rico, it was
necessary that the church should show that it had complied
with all these conditions before it could be entitled to sue.

*Mr. Frederic R. Coudert* and *Mr. Howard Thayer Kingsbury*,
with whom *Mr. Paul Fuller* was on the brief, for appellee:-

The law under which this suit was brought by the church
is a valid enactment of the legislative assembly of Porto Rico,
wholly within the scope of its powers under the organic act.
*Kent* v. *Porto Rico*, 207 U. S. 113, 117. The act does not come
within the prohibitions, in the general laws of Congress re-
lating to the Territories, as to local and special laws, etc. *Amer-
ican Ins. Co.* v. *Canter*, 1 Pet. 511; *Hornbuckle* v. *Toombs*, 18
Wall. 648. But whether so or not, the act under consideration
is not objectionable as a special law. *Vanzant* v. *Waddell*, 2
Yerg. 260; *Cotting* v. *Kansas City Stock Yards Co.*, 183 U. S.
105; *People ex rel. Kenny* v. *Folks*, 89 App. Div. (N. Y.) 179;
*United States* v. *Union Pac. Co.*, 98 U. S. 569. See also *Bank
of Columbia* v. *Okely*, 4 Wheat. 255; *Bank of Newbern* v. *Taylor*,
6 N. C. 266.

The Roman Catholic Church in Porto Rico is a juristic per-
sonality and a legal entity under the laws of Porto Rico, as
it had always been under the Spanish laws in force in the
island at the time of the ratification of the Treaty of Paris.

The Roman Catholic Church has been recognized as possessing a legal personality and a capacity to take and acquire property since the time of the Emperor Constantine. The American law has been no less liberal in recognizing the corporate entity of churches than has the European and English law. *Werlein* v. *New Orleans*, 177 U. S. 390, 401. The Holy See still occupies a recognized position in international law of which the courts must take judicial notice. 1 Moore's Digest of Int. Law, pp. 130, 131.

Upon the facts stated in the petition the church has a good title to the property in question.

MR. CHIEF JUSTICE FULLER, after making the foregoing statement, delivered the opinion of the court.

This suit was brought under an act of the legislative assembly of Porto Rico, entitled "An act to confer original jurisdiction on the Supreme Court of Porto Rico for the trial and adjudication of certain property claimed by the Roman Catholic Church in Porto Rico," approved March 10, 1904, as follows:

"*Be it enacted by the Legislative Assembly of Porto Rico:*

"SEC 1. Original jurisdiction is hereby conferred on the Supreme Court of Porto Rico for the trial and adjudication of all questions now existing or which may arise, between the Roman Catholic Church in Porto Rico and the people of Porto Rico, affecting property rights, whether real or personal or mixed, claimed by either party.

"SEC. 2. The Attorney General of Porto Rico shall be authorized to accept service for the people of Porto Rico of any citation, summons or other process issued by said court in said proceedings.

"SEC. 3. The Supreme Court, for the purpose of such trial and adjudication, shall have the right to issue process for witnesses and to receive and hear testimony, and the procedure in said court shall be the same, as near as may be, as that prescribed for the District Courts of Porto Rico in civil cases, and

the Supreme Court shall have full power to enter any and all orders and decrees that may be necessary to a final and full adjudication of all the claims of either party to the proceedings, and may issue all writs or process necessary to enforce the jurisdiction hereby conferred upon said court: *Provided*, that the Attorney General of Porto Rico shall at once prepare for such hearing and trial, and if the said Roman Catholic Church does not commence proceedings under this act within three months after its passage and approval, then, in that event, it shall be the duty of the Attorney General to commence said proceedings in behalf of the insular government.

"SEC. 4. After the issues have been fully submitted to said court upon the law and the facts, and after hearing the arguments of the respective parties, or their counsel, the court shall enter a final judgment and decree, fully determining the rights of either or both of the parties, and vesting the title to the subject-matter of the controversy, or any part thereof, in such party or parties, as the court may deem entitled thereto. The said court may issue any and all writs that may be necessary to place the parties in quiet possession of the property so adjudicated to them, or either of them. But nothing in this act shall be construed to limit the right of appeal, either of the people of Porto Rico or of the Roman Catholic Church, but either party may appeal from the final judgment or decree of said court to the Supreme Court of the United States, in the manner provided by law for appeals to that court generally.

"SEC. 5. Original jurisdiction is hereby also conferred on the Supreme Court of Porto Rico for the trial and adjudication of all questions now existing, or which may arise, between the Roman Catholic Church in Porto Rico and any municipality of Porto Rico, affecting property rights, whether real or personal or mixed, claimed by either party.

"SEC. 6. The mayor of any municipality within Porto Rico, wherein may be situated any property over which such questions exist, shall be authorized to accept service for the munic-

ipality of any citation, summons or other process issued by said court in said proceedings.

"SEC. 7. For the purpose of such trial and adjudication and appeal, all the provisions of sections 3 and 4 of this act shall be deemed applicable.

"SEC. 8. This act shall take effect from and after its passage."

The power to confer this jurisdiction was derived from the act of Congress creating an organized government for Porto Rico, approved March 2, 1901, usually called the Foraker Act, c. 191, 31 U. S. Stat. 77.

Section 8 of this act provides:

"That the laws and ordinances of Porto Rico now in force shall continue in full force and effect, except as altered, amended, or modified hereinafter, or as altered or modified by military orders and decrees in force when this act shall take effect, and so far as the same are not inconsistent or in conflict with the statutory laws of the United States not locally inapplicable, or the provisions hereof, until altered, amended, or repealed by the legislative authority hereinafter provided for Porto Rico or by act of Congress of the United States."

It is further provided (§ 15):

"That the legislative authority hereinafter provided shall have power by due enactment to amend, alter, modify, or repeal any law or ordinance, civil or criminal, continued in force by this act, as it may from time to time see fit."

The paragraph relating to the judiciary is as follows (§ 33):

"That the judicial power shall be vested in the courts and tribunals of Porto Rico as already established and now in operation, including municipal courts, under and by virtue of General Orders, numbered 118, as promulgated by Brigadier General Davis, United States Volunteers, August 16, 1899, and including also the police courts established by General Orders, numbered 195, promulgated November 29, 1899, by Brigadier General Davis, United States Volunteers, and the laws and ordinances of Porto Rico and the municipalities thereof in force, so far as the same are not in conflict herewith, all of

which courts and tribunals are hereby continued. The juris-
diction of said courts and the form of procedure in them, and
the various officials and attachés thereof, respectively, shall
be the same as defined and prescribed in and by said laws and
ordinances, and said General Orders, numbered 118 and 195,
until otherwise provided by law: *Provided, however,* that the
Chief Justice and Associate Justices of the Supreme Court and
the marshal thereof shall be appointed by the President, by
and with the advice and consent of the Senate, and the judges
of the District Court shall be appointed by the Governor, by
and with the advice and consent of the Executive Council, and
all other officials and attachés of all the other courts shall be
chosen as may be directed by the legislative assembly, which
shall have authority to legislate from time to time as it may
see fit with respect to said courts, and any others they may
deem it advisable to establish, their organization, the number
of judges and officials and attachés for each, their jurisdiction,
their procedure, and all other matters affecting them."

Clearly under these sections of the organic act the legislative
assembly had express authority to legislate regarding the juris-
diction and procedure of its courts. While the jurisdiction of
the other courts might be changed, the proper interpretation
of the statute prevents the legislative assembly from passing
an act in any wise affecting the jurisdiction of the Supreme
Court or the District Courts.

In *Kent* v. *Porto Rico,* 207 U. S. 113, 115, it was contended
that an act of the local legislature, creating additional judicial
districts and changing those fixed by the military orders and
local law, referred to in the organic act, and also reducing the
number of judges in the District Court from three to one,
"was void, because in conflict with the provision of the thirty-
third section of the act of Congress," the same one here relied
upon by the appellant as making the jurisdiction of the courts
unchangeable save by Congress.

But to that contention this court replied:

"The argument is that this local law, in so far as it changed

the District Courts, and especially in so far as it provided for one instead of three judges to preside over each court, 'was void, because in conflict with the provision of the thirty-third section of the act of Congress. The contention amounts to this, that there were no District Courts in Porto Rico from the time of the going into effect of the Porto Rican act in 1904 up to the present time. Whilst the proposition presents a formal Federal question, we think it is clear that it is so frivolous as to bring it within the rule announced in *American Railroad Co. v. Castro, supra.* We say this, because we think that no other conclusion is reasonably possible from a consideration of the whole of section 33 of the act of Congress and the context of that act, particularly section 15 thereof, both of which are reproduced in the margin.[1]

"We do not deem it necessary to analyze the text of the act of Congress to point out the inevitable result just stated, since the obvious meaning of the act is established by a decision heretofore rendered. *Dones* v. *Urrutia,* 202 U. S. 614. . . . On appeal to this court the questions raised were fully argued in printed briefs, but were deemed to be of such a frivolous character as not to require an opinion, and were hence disposed of *per curiam,* referring to the provisions of the statute and pertinent authorities."

It is true that the act of Congress of July 30, 1886, c. 818, 24 Stat. 170, enacts "that the legislatures of the Territories of the United States now or hereafter to be organized shall not pass local or special laws in any of the following enumerated cases," and among the prohibitions are those against "regulating the practice in courts of justice," and granting "to any corporation, association, or individual any special or exclusive privilege, immunity or franchise." But such general prohibitions have no application where specific permission to the contrary is granted by the organic act applying to the particular Territories.

---

[1] See note at foot of p. 116, 207 U. S.

This act is not a special law regulating the practice in .courts of justice nor one granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise. It confers the same right upon the people of Porto Rico and upon the municipalities as upon the church.

In the organic acts for the Territories (59th Congress, Senate Doc. 148) it appears that it has been usual for Congress to give the local legislatures the power to regulate the jurisdiction and procedure of their courts.

In *Hornbuckle* v. *Toombs*, 18 Wall. 648, after reviewing the question, the court, speaking through Mr. Justice Bradley, said (p. 655):

"Whenever Congress has proceeded to organize a government for any of the Territories it has merely instituted a general system of courts therefor, and has committed to the Territorial assembly full power, subject to a few specified or implied conditions, of supplying all details of legislation necessary to put the system into operation, even to the defining of the jurisdiction of the several courts. . . . The powers thus exercised by the Territorial legislatures are nearly as extensive as those exercised by any State legislature; and the jurisdiction of the Territorial courts is collectively coëxtensive with and correspondent to that of the State courts.

\*     \*     \*     \*     \*     \*     \*     \*

"From a review of the entire past legislation of Congress on the subject under consideration, our conclusion is that the practice, pleadings and forms and modes of proceeding of the Territorial courts, as well as their respective jurisdictions, subject, as before said, to a few express or implied conditions in the organic act itself, were intended to be left to the legislative action of the Territorial assemblies, and to the regulations which might be adopted by the courts themselves."

The Porto Rican act under consideration merely repeats the action of Congress in the past in organizing other Territories. The appellant contends "that the Roman Catholic Church of Porto Rico has not the legal capacity to sue, for the

reason that it is not a judicial person, nor a legal entity, and is without legal incorporation. . . . If it is a corporation or association, we submit to the court that it is necessary for. the Roman Catholic Church to specifically allege its incorporation, where incorporated, and by virtue of what authority or law it was incorporated, and if a foreign corporation show that, it has filed its articles of incorporation or association in the' proper office of the government, in accordance with the laws of Porto Rico."

Since April 11, 1899, Porto Rico has been *de facto* and *de jure* American territory. The history of Porto Rico and its legal and political institutions up to the time of its annexation to the United States are matters which must be recognized by this court as the ancient laws and institutions of many of our States when matters come before it from their several jurisdictions.

The court will take judicial notice of the Spanish law as far as it affects our insular possessions. It is *pro tanto* no longer foreign law.

The Civil Code in force in Cuba, Porto Rico and the Philippines at the time of the Treaty of Paris contains these provisions (Art. 35): ·

. "Art. 35. The following are judicial persons: The corporations, associations and institutions of public interest recognized by law. Their personality begins from the very instant in which, in accordance with law, they are validly established."

"Art. 38. Judicial persons may acquire and possess property of all kinds as well as contract obligations and institute civil or criminal actions in accordance with the laws and rules of their establishment.

· "The church shall be governed in this particular by what has been agreed upon by both powers and educational and charitable institutions by the provisions of special laws."

The phrase "agreed upon by both powers" refers to the "concordats" or treaties between the Holy See and the Spanish crown, which recognize the right of the church to possess and acquire property.

The law thus recognized at the time of the cession the juristic personality and legal status of the church.

In *Ortega* v. *Lara*, 202 U. S. 339, 342, this court said:

"By the general rule of public law, recognized by the United States, whenever political jurisdiction and legislative power over territory are transferred from one nation to another, the laws of the country transferred, intended for the protection of private rights, continue in force until abrogated or changed by the new government. Of course, in case of cession to the United States, laws of the ceded country inconsistent with the Constitution and laws of the United States, so far as applicable, would cease to be of obligatory force; but otherwise the municipal laws of the acquired country continue.

"Nevertheless, and apparently largely out of abundant caution, the eighth section of the act of April 12, 1900, provided: 'That the laws and ordinances of Porto Rico, now in force, shall continue in full force and effect, except as altered, amended, or modified hereinafter, or as altered or modified by military orders and decrees in force when this act shall take effect, and so far as the same are not inconsistent or in conflict with the statutory laws of the United States not locally inapplicable, or the provisions hereof, until altered, amended, or repealed by the legislative authority hereinafter provided for Porto Rico or by act of Congress of the United States, . . .' "

Article 8 of the Treaty of Paris is to this effect:

"And it is hereby declared that the relinquishment or cession, as the case may be, to which the preceding paragraph refers, cannot in any respect impair the property or rights which by law belongs to the peaceful possession of property of all kinds, of provinces, municipalities, public or private establishments, ecclesiastical or civic bodies, or any other associations having legal capacity to acquire and possess property in the aforesaid territories, renounced or ceded, or of private individuals of whatever nationality such individuals may be."

This clause is manifestly intended to guard the property of the church against interference with, or spoliation by, the new master, either directly or through his local governmental agents. There can be no question that the ecclesiastical body referred to, so far as Porto Rico was concerned, could only be the Roman Catholic Church in that island, for no other ecclesiastical body there existed.

The mortgage law, in force in Porto Rico both before the cession and at present, provided for the registration generally of "Title deeds of real property or property rights owned or administered by the State or by civil or ecclesiastical corporations, subject to the provisions of law or regulations." (Art. 2, paragraph 6.)

But this was qualified by the general regulations for the execution of the mortgage law (see translation of general regulations for the execution of the mortgage law for Cuba, Porto Rico and the Philippines, War Department, 1899), which provided:

"Art. 25. Exceptions to the record required by article two of the law are—

"First. Property which belongs exclusively to the eminent domain of the State, and which is for the use of all, such as the shores of the sea, islands, etc., etc., walls of cities and parts, ports and roadsteads, and any other analogous property during the time they are in common and general use;

"Second. Public temples, dedicated to the Catholic faith."

Of course, the temples in question were not subject to the registration law, and were recognized as a peculiar class of property, wholly different from that belonging to private individuals.

Counsel for appellee well argues that the Roman Catholic Church has been recognized as possessing a legal personality and the capacity to take and acquire property since the time of the Emperor Constantine. And he quotes from the Code of Justinian the law of Constantine of 321 to that effect.

The strictest prohibition against alienating the property of

the church exists in that code, and it provides that the alienation of church property shall not take place, even with the assent of all the representatives of the church, since these rights "belong to the church," and the church is the mother of religion; and as faith is perpetual, its patrimony must be preserved in its entirety perpetually.

In his History of Latin Christianity (vol. 1, p. 507), Dean Milman says:

"The Christian Churches succeeded to that sanctity which the ancient law had attributed to the temples; as soon as they were consecrated they became public property, and could not be alienated to any other use. The ground itself was hallowed, and remained so even after the temple had been destroyed. This was an axiom of the heathen Papinian. Gifts to temples were alike inalienable, nor could they be pledged; the exception in the Justinian code betrays at once the decline of the Roman power, and the silent progress of Christian humanity. They could be sold or pledged for the redemption of captives, a purpose which the old Roman law would have disdained to contemplate."

And Milman also points out that in the barbarian codes most sweeping provisions are found, recognizing the right of the church to acquire property and its inalienability when acquired. Church property everywhere remained untouched by the rude hands of invading barbarians. Trespass upon or interference with such property was severely punished, and gradually it became exempted from taxation.

The historic continuity of the juristic conception, exemplified by the civil law, is maintained by the Partidas, the fundamental code of ancient Spanish law, whose provisions show that whoever built a church was required to provide it with an adequate perpetual endowment as well as a site, and refute any idea of a retention of ownership by the donor of the land or the contributors to the building.

In Law I, Title XI, part I, it is stated:

" . . . And in addition, the churches have other privi-

leges; that as to the estates which have been given or sold or left to them lawfully by will, even if they have not received possession of them, they get the title and right which has been given or sold or left to them, so that they can demand them for their own against whomsoever may hold them."

In Law I, Title XIV, part I, we find a general prohibition against the alienation of church property, certain exceptions being enumerated.

While Law II provides that when alienation is permitted it shall be made only by the prelates, with the authorization of their chapters; that lands shall be sold only in default of sufficient personalty to meet the requirements of the case, and that lands given by the Emperor or the King shall never be alienated.

Then Law VI, Title XXIX, part III, the law governing prescription, provided that "a consecrated, or holy, or religious thing cannot be acquired by lapse of time."

Again, Law XXVI, Title XXIX, part III, provided that lands belonging to the church (but apparently not actually consecrated) cannot be acquired by prescription in less than forty years; that destructible personal effects can be acquired by prescription in three years; and then: "But the others which belong to the Church of Rome exclusively cannot be acquired by any one in less than one hundred years."

This was in substance the law of Spain and the rest of Europe throughout the middle ages, certain modifications being made in the way of prohibitions limiting the right to give to the church, which in no way affected the juristic personality of the church or its general right to hold and acquire property in its corporate capacity.

As to England, the concept of the church as a corporation was worked out by the English canonists and fully recognized by the ordinary law courts before the end of the fourteenth century, and Pollock and Maitland show that the English ecclesiastical law was practically similar to that of continental Europe in its recognition of the property rights of the church.

In this country it was held in *Terrett* v. *Taylor* (1815), 9 Cranch, 43, that the legislature of Virginia could not authorize any persons to take land formerly granted to the Church of England. Mr. Justice Story, speaking for the court, says (p. 49):

"Be, however, the general authority of the legislature as to the subject of religion, as it may, it will require other arguments to establish the position that, at the Revolution, all the public property acquired by the Episcopal churches, under the sanction of the laws, became the property of the State. Had the property thus acquired been originally granted by the State or the King, there might have been some color (and it would have been but a color) for such an extraordinary pretension. But the property was, in fact and in law, generally purchased by the parishioners or acquired by the benefactions of pious donors. The title thereto was indefeasibly vested in the churches, or rather in their legal agents. It was not in the power of the crown to seize or assume it; nor of the Parliament itself to destroy the grants, unless by the exercise of a power the most arbitrary, oppressive and unjust, and endured only because it could not be resisted. . . . Nor are we able to perceive any sound reason why the church lands escheated or devolved upon the State by the Revolution any more than the property of any other corporation created by the royal bounty or established by the legislature."

This court further held that it made no difference whether the church was a voluntary society or clothed with corporate powers, and the local authorities were restrained from interfering with the church property or claiming title thereto.

It is the settled law of this court that a dedication to a public or charitable use may exist, even where there is no specific corporate entity to take as grantee. *Werlein* v. *New Orleans,* 177 U. S. 390, 401, and see *Beatty* v. *Kurtz,* 2 Pet. 566.

The Spanish law as to the juristic capacity of the church at the time of the cession merely followed the principles of the Roman law, which have had such universal acceptance, both

in the law of continental Europe and in the common law of England.

Roman Catholicism has been the official religion of Spain since the time of the Visigoths. As far as the church in Spanish-America was concerned, the King of Spain was supreme patron. See Alcubilla, vol. 8, p. 662.

The laws enacted in Spain for the government of the Indies, and promulgated at different periods, were compiled by order of Philip IV in 1661, in the " Recopilacion " of the Laws of the Indies, of which a subsequent edition was published. This is the only authentic collection of the ordinances and decrees governing Spanish-America prior to the year 1860. Alcubilla, vol. 9, p. 936.

Under the bulls of Julius II and Alexander XI there were conceded to the Spanish crown all the tithes of the Indies, under the condition of endowing the church and providing the priests with proper support. The church in Spanish-America, through this royal patronage, came into possession of considerable properties. The right of the church to own, maintain and hold such properties was unquestioned, and the church continued in undisputed possession thereof.

In the year 1820 the Spanish revolutionary government passed certain confiscatory laws as to monasteries and other ecclesiastical foundations, but even these revolutionary enactments left the actual temples undisturbed.

There was further legislation to the same effect in 1835, and again in 1837, but this legislation does not appear to have ever been extended to the colonies, although it was wrongfully but effectually applied there by the seizure of church properties, afterwards agreed to be restored by the concordats of 1851 and 1859. After more than twenty-five years of intermittent conflict between church and state, the Spanish government and the papacy concluded the concordat of March 16, 1851, which had in Spain the force of law, and which was promulgated in the insular possessions. Alcubilla, vol. 3, p. 94, Diccionario de La Administracion Española.

By the first article of this concordat it is provided:

" That the Catholic apostolic religion, to the exclusion of any other religion whatever, shall continue to be the sole religion of the Spanish nation, and will always be preserved in the domains of His Catholic Majesty, with all the rights and privileges, which it ought to enjoy, according to the law of God and the provisions of its sacred canons."

Article 11 of the Spanish constitution of 1876 is to the same effect. Alcubilla, vol. 3, p. 357.

There are numerous provisions in the concordat fixing the amounts to be paid by the State for the support of the church and for the settlement of other causes of difficulty between the crown and the Roman See, and art. 41 specifically recognizes the church's " right of property in everything it now possesses or may hereafter acquire." Alcubilla, vol. 3, p. 109.

In 1859, as a further guaranty of the property rights of the church, an additional concordat was made between the Spanish crown and the Roman See. The first article of this, reciting the unfortunate events by reason of which ecclesiastical properties have been wrongfully taken, obligates the Spanish crown not to sell or alienate any of these properties without the permission of the Holy See.

The third article reads as follows:

" Art. 3. Especially the government of His Majesty again formally recognizes the full and free right of the church to acquire, retain and enjoy in full property right and without limitation or reserve all kinds of property and values, renouncing in consequence by this treaty any disposition contrary hereto and particularly those which may be contained in the law of May 1st, 1855. The properties which in virtue of this right the church may acquire and possess in future are not to be considered as part of the donation which is assigned to it by the concordat."

The difficulties between church and state incident to the revolutionary movement were thus adjusted, but in 1868, during the regime of the provisional government, there were

certain decrees closing all conventual establishments, etc., but the relations between the church and the government were finally restored by King Alfonso XII, who, in January, 1875, issued a decree, returning to the church all the property belonging to the clergy which was still in the hands of the government.

None of these revolutionary decrees disturbed actual church edifices, but were directed almost wholly against conventual properties, belonging to the various congregations or monastic orders. The attacks were directed against the property of the regular clergy and not that of the seculars.

Under the civil law of Spain, the collection of tithes and first fruits of land and stock was obligatory. First, they were collected by the church, but later collected by the government and turned over to the church. The levy of such tithes finally disappeared under the concordat, because the government paid all expenses of worship.

In Report No. 2977, Senate Doc. 57th Congress, 2d Session, the subject was discussed, and, in accordance with the terms of the concordat, down to the occupation of Porto Rico by the American troops in August, 1898, amounts were regularly appropriated by the Spanish Government for the expenses of worship in Spain, Cuba, Porto Rico and the Philippines.

At the date of the American military occupation neither the State nor the municipalities, directly or indirectly, disputed or questioned the legitimate ownership and possession by the church of the property occupied by her, including temples, parochial houses, seminaries and ecclesiastical buildings of every description. It is only since the occupation that some of the ayuntamientos have evinced a desire to deprive the church of her temples, under the pretext that they were built with municipal funds.

At the time of the American occupation the Catholic Church was the only church in the island. In 1900, Governor Allen, in the first annual report, said, p. 54:

" Out of the 953,243 inhabitants of Porto Rico, there are nearly 950,000 Catholics, and there is a Catholic church in

every town and village and in the larger towns and cities several; in the city of San Juan there are eight, including the cathedral. Nearly all these are well-built structures, occupying central locations, and are ornaments to the towns where situated. There are many parochial schools and other church institutions, belonging to the Catholics. . . . None of the public money is now used in the salaries of clergymen or otherwise in the support of religion. All such expenses are defrayed, as in the United States, by voluntary contribution of the congregation and friends on the continent. The controversies formerly existing between the municipal and the church authorities concerning the ownership of church property have not yet been settled."

This was the status at the moment of the annexation, and by reason of the treaty, as well as under the rules of international law prevailing among civilized nations, this property is inviolable.

The corporate existence of the Roman Catholic Church, as well as the position occupied by the papacy, has always been recognized by the Government of the United States.

At one time the United States maintained diplomatic relations with the Papal States, which continued up to the time of the loss of the temporal power of the papacy. Moore's Digest of Int. Law, vol. 1, pp. 130, 131.

The Holy See still occupies a recognized position in international law, of which the courts must take judicial notice.

"The Pope, though deprived of the territorial dominion which he formerly enjoyed, holds, as sovereign pontiff and head of the Roman Catholic Church, an exceptional position. Though, in default of territory, he is not a temporal sovereign, he is in many respects treated as such. He has the right of active and passive legation, and his envoys of the first class, his apostolic nuncios, are specially privileged. Nevertheless he does not make war, and the conventions which he concludes with states are not called treaties, but concordats. His relations with the Kingdom of Italy are governed, unilaterally, by

the Italian law of May 13, 1871, called 'the law of guarantees,' against which Pius IX and Leo XIII have not ceased to protest." 1 Moore's Dig. 39.

After the cession of Louisiana by France to the United States certain questions came up as to the title to lands granted by the King of Spain to the Roman Catholic Church. The opinion of Attorney General Wirt, having been asked thereon, he wrote as follows, 1 Op. Atty. Gen. 563.

" There can be no doubt of the power of the King of Spain to grant lands in Florida while the province was his, nor of the capacity of the Roman Catholic Church to take by grant. Our treaty with Spain recognizes and ratifies all such grants made prior to a certain day."

The proposition, therefore, that the church had no corporate or jural personality seems to be completely answered by an examination of the law and history of the Roman Empire, of Spain and of Porto Rico down to the time of the cession, and by the recognition accorded to it as an ecclesiastical body by the Treaty of Paris and by the law of nations.

Appellant claims that there were some laws of Porto Rico which should have been complied with before the Roman Catholic Church could have any corporate existence or right to sue. It may be assumed that he refers to the various laws of Porto Rico relating to the formation and regulation of business corporations. But it is plain that none of these laws have any application to the church and never were so intended.

If the people of Porto Rico had passed some law, by which the manner of holding properties by ecclesiastical bodies through trustees or otherwise, or the method in which such body should be represented before the courts were prescribed, a different question would arise. But there was no such law, and by the Spanish law, from the earliest moment of the settlement of the island to the present time, the corporate existence of the Catholic Church has been recognized. As counsel for the appellee says: " At the very least, and even assuming that for centuries the church had not been recognized as a body of equal

importance with the State in Porto Rico, but that it was a merely *de facto* organization or association holding property it would nevertheless have sufficient standing to maintain this suit."

There is no pretense in the corporation law of regulating the manner in which the Roman Catholic Church or any other religious corporation or body shall hold its property. No question of conformity to any law of " Sociétés Cultuelles" or of " Associations" or religious societies can here arise, since there are no statutes relating to any such genus of legal or artificial persons.

The general law as to corporations is found in Titles I and II of the Civil Code now in force. We give in the margin sections 27–30 and part of section 65.[1]

---

[1] SEC. 27. The following are artificial persons:

(1) Corporations, associations and institutions of public interest, having artificial personality recognized by law.

The personality of such bodies shall commence from the moment of their establishment in accordance with law.

(2) Private associations, whether civil, commercial or industrial, to which the law grants legal personality.

SEC. 29. The civil status of corporations shall be governed by the laws which create or recognize them; that of associations by their by-laws; and that of institutions by the rules of their establishment duly approved by administrative action when such requisite be necessary.

SEC. 30. Artificial persons may acquire and possess property of all kinds and also contract obligations and institute civil and criminal actions in accordance with the laws and regulation of their establishment.

SEC. 65. All corporations or joint stock companies, organized under the laws of any State, or of the United States, or of any foreign government, shall, before doing business within this island, file in the office of the secretary a duly authenticated copy of their charters or articles of incorporation, and also a statement verified by the oath of the president and secretary of said corporation, and attested by the majority of its board of directors, showing—

(1) The name of such corporation and the location of its principal office or place of business, without this island; and if it is to have any place of business or principal office within this island, the location thereof.

(2) The amount of its capital stock.

(3) The amount of its capital stock actually paid in, in money.

(4) The amount of its capital stock paid in, in any other way, and in what, etc.

Domestic corporation law is equally inapplicable. Its terms are found in the Civil Code, Title II, chap. I, and have reference solely to business or commercial corporations. No religious, eleemosynary or charitable corporation can fall within its purview. Stock, stockholders, capital, surplus, officers, directors, the doing of business are the basic elements of this statute.

The properties of the church in Cuba and the Philippines at the time of the ratification of the treaty were far more considerable than those in Porto Rico. And the controversies or questions arising as to those properties have been quite generally adjusted in both Cuba and the Philippines partly with and partly without recourse to the courts. In Cuba a commission was appointed to consider the whole question and its report contains much interesting and pertinent information. It begins with the fundamental proposition that: " The church, as a juridical person, has held and holds the right to acquire, possess, or transfer all kinds of properties. The church has never been denied this right in Spain; rather, on the contrary, in all the provisions covering these matters this right has been recognized in the church," Sen. Rep. 2977, 57th Cong., 2d Sess., p. 12.

On this admitted basis was concluded a satisfactory adjustment of the difficult problem incident to the transfer of sovereignty from a regime of union of church and state to the American system of complete separation.

Even greater difficulties were settled in the Philippines, and the American Government never suggested that the church was without juristic capacity to possess or protect property rights. The suggestion that it did not possess a license from the local authorities " to do business " was never put forward.

Whether these ecclesiastical properties originally came from the State or any subdivision thereof, they were donated to, at once became and have ever since remained the property and in the peaceful possession of the Roman Catholic Church.

In the Philippines, the Supreme Court of the islands has recently treated these questions in an interesting and satisfactory opinion. *Barlin* v. *Ramirez*, 7 Philippines, 41. The sug-

VOL. CCX—21

gestion, made there as here, that the church was not a legal person entitled to maintain its property rights in the courts, the Supreme Court answered by saying that it did not require serious consideration when " made with reference to an institution which antedates by almost a thousand years any other personality in Europe."

It is urged that the complaint does not state facts sufficient to constitute any cause of action, and that it admits that the property in question was constructed out of funds of the municipality of Ponce, Porto Rico. This contention has been sufficiently answered. Counsel for appellee rightly says that—

" Whether the property originally came from the crown or the local government is immaterial, since it had been for centuries recognized as the property of the church. Because the Spanish crown or one of its municipal agencies chose to donate churches some years or centuries ago, it scarcely follows that it can now be claimed that the gift is revocable, and that the municipality may now expropriate the church and convert the property to any purpose it may desire."

In his statement to His Holiness, the Pope, when on special mission, Mr. Taft, the then Governor General of the Philippines, said, in referring to those islands:

" The transfer of sovereignty and all governmental property rights and interests from the crown of Spain to the United States in the Philippine Islands contained in the Treaty of Paris was a transfer from a government between which and the Church of Rome there had been in those islands the closest association in property, religion, and politics, to a government which by the law of its being is absolutely prevented from having such associations with any church. To make the transfer effectual, and, at the same time just, it is obvious that the proper line of division must be drawn between what were really civil property interests of the crown of Spain and what were religious trusts of the Catholic Church, and that all union of civil and clerical agencies for performance of political functions must end." Report of the Secretary of War, 1902, p. 237.

In *Mormon Church* v. *United States*, 136 U. S. 1, 53, Mr.. Justice Bradley said:

"By the Spanish law, whatever was given to the service of God, became incapable of private ownership, being held by the clergy as guardians or trustees; . . . when property was given for a particular object, as a church, a hospital, a convent or a community, etc., and the object failed, the property did not revert to the donor, or his heirs, but devolved to the crown, the church or other commune or community," etc.

All the public funds employed in church buildings and other property were appropriated for that purpose without any reservation or restriction whateve., being approved according to law by the representatives of the nation in the Cortes, or by those of the towns in the common councils. Therefore the application of funds thus appropriated and voted by the legitimate mandataries of the nation or of the municipalities constituted, from the standpoint of law and justice, a perfect, irrevocable gift.

Certain objections in the nature of matters of procedure made by appellant we do not think we need consider. They may be classified as follows:

(1) Misjoinder of causes of action; (2) Insufficiency and irregularity of form; (3) Bar of statute of limitations; and (4) Lack of authority to bring suit in name of the church.

We do not regard either of these as possessing sufficient merit to require discussion.

We accept the conclusions of appellee's counsel as thus summarized:

"First. The legislative assembly of Porto Rico had the power to confer jurisdiction on the Supreme Court of the island of this special class of controversies. Such legislation was not contrary to the constitution and was in conformity with the power conferred by Congress upon the legislative assembly to regulate the jurisdiction of the courts.

"Second. The Roman Catholic Church has been recognized as possessing legal personality by the treaty of Paris and its

property rights solemnly safeguarded. In so doing the treaty has merely followed the recognized rule of international law which would have protected the property of the church in Porto Rico subsequent to the cession. This juristic personality and the church's ownership of property had been recognized in the most formal way by the concordats between Spain and the papacy and by the Spanish laws from the beginning of settlements in the Indies. Such recognition has also been accorded the church by all systems of European law from the fourth century of the Christian era.

" Third. The fact that the municipality may have furnished some of the funds for building or repairing the churches cannot affect the title of the Roman Catholic Church, to whom such funds were thus irrevocably donated and by whom these temples were erected and dedicated to religious uses."

*Decree affirmed.*