El Pueblo de Puerto Rico, querellante, *v.* The Fajardo Sugar Company of Porto Rico, The Fajardo Sugar Growers' Association y Loíza Sugar Company, demandadas.

Núm. 1.—*Sometido:* Mayo 16, 1936. *Resuelto:* Junio 4, 1936.

164

*Hon. Procurador General B. Fernández García; M. Guerra Mondragón, R. Rivera Zayas y Lester P. Schoene,* abogados del querellante; *J. Henri Brown, Jaime Sifre Jr., y José A. Poventud y Arturo Aponte,* abogados, respectivamente, de las demandadas.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

A instancias del Fiscal General de Puerto Rico, esta corte, el 28 de enero último, ordenó que se instruyera una información de la naturaleza del *"quo warranto"* en este caso, concediéndose a las querelladas hasta el 28 de febrero siguiente para excepcionar, contestar o formular cualquiera otra alegación que procediera.

El cinco de febrero el querellante radicó una moción solicitando la inspección y la obtención de copias de ciertos libros, papeles y documentos en posesión o bajo el control de las querelladas y éstas el quince del propio mes se opusieron por escrito entre otros motivos porque esta corte por diversas razones que expusieron no tenía a su juicio jurisdicción para actuar en el asunto.

Pidió el querellante que fueran eliminadas de las oposiciones determinadas cuestiones de derecho suscitadas, entre ellas las relativas a la jurisdicción. Se oyó sobre el particular a ambas partes y la corte decidió que no era posible resolver la cuestión de inspección descartando la de jurisdicción y señaló el 16 de marzo, 1936, para oír de nuevo a las

partes. Fueron en efecto oídas ampliamente, archivando además alegatos en apoyo de sus respectivas posiciones quedando radicado el último el 16 de mayo, 1936.

¿Cuál es la cuestión envuelta? La posesión de tierras por corporaciones agrícolas. ¿Qué pide El Pueblo de Puerto Rico por medio de su Fiscal General? Que esta corte dicte sentencia de pérdida de franquicia en cuanto a The Fajardo Sugar Company of Porto Rico y a The Loíza Sugar Company, ordenando su disolución inmediata y prohibiéndoles seguir haciendo negocios en Puerto Rico, imponiéndoles la multa correspondiente, y en cuanto a The Fajardo Sugar Growers' Association que dicte sentencia condenándola a cesar de hacer negocios en esta Isla, con todos los demás pronunciamientos que en equidad y justicia sean pertinentes en cuanto a todas.

Se alega substancialmente en la querella que The Fajardo Sugar Company of Porto Rico es una corporación que fué organizada de acuerdo con las leyes de esta Isla en febrero 28, 1919, siendo sus propósitos dedicarse a la agricultura y a la fabricación de azúcar, especificándose en sus cláusulas de incorporación que su derecho a poseer o controlar tierras en Puerto Rico estaría limitado a quinientos acres solamente, tal como se establece en la sección 3 de la Resolución Conjunta del Congreso de los Estados Unidos de América, aprobada en mayo 1; 1900, y que eso no obstante adquirió todas las propiedades de The Fajardo Sugar Company, una corporación organizada bajo las leyes del Estado de Nueva York en 1905 dedicada en esta Isla a la agricultura y a la fabricación de azúcar, que tanto por sí como por medio de la querellada The Fajardo Sugar Growers' Association había adquirido de tiempo en tiempo la propiedad o el control de tierras en Puerto Rico que sumaban unos treinta mil setecientos acres.

Con respecto a The Fajardo Sugar Growers' Association se alega substancialmente en la querella que es una entidad

que se describe a sí misma como una compañía por acciones, que fué organizada bajo las leyes del Estado de Nueva York para dedicarse al cultivo de la caña de azúcar y adquirir por compra, arriendo o cualquier otro medio las tierras que fueren necesarias para realizar sus fines y que habiendo cumplido con lo exigido por la ley de corporaciones privadas de Puerto Rico aprobada en marzo 9, 1911, quedó autorizada para hacer negocios en la Isla. Sigue una serie de alegaciones tendentes a demostrar que es de hecho una corporación.

Y alega la querella substancialmente con respecto a la otra querellada Loíza Sugar Company, que es una corporación organizada de acuerdo con las leyes de Puerto Rico para comprar y arrendar tierras y sembrar y cosechar caña de azúcar. Lo mismo que las de la primera querellada, sus propias cláusulas de incorporación expresamente establecen que su derecho a poseer y controlar tierras estará limitado a quinientos acres de acuerdo con la Resolución Conjunta del Congreso citada anteriormente, a pesar de lo cual era dueña y controlaba en octubre 6, 1925, unos once mil treinta y ocho acres de terreno en la Isla.

Continúa alegándose substancialmente en la querella que el 6 de octubre de 1925 la querellada The Fajardo Sugar Company of Porto Rico adquirió por compra todas las acciones del capital de la Loíza Sugar Company y aún controla el 99 por ciento de las mismas y de tal modo maneja y domina sus negocios; que por escritura pública otorgada en enero 10, 1935, la Loíza Sugar Company traspasó a The Fajardo Sugar Growers' Association, con el fin de ocultar la entidad verdaderamente dueña de las mismas, todas las tierras de labranza que poseía y controlaba en Puerto Rico, a excepción de unos quinientos noventa y ocho acres que todavía posee y controla en su propio nombre individual.

Se hace referencia en la querella a ciertos instrumentos otorgados demostrativos a juicio del querellante de la inter-

dependencia de las tres querelladas y se alega textualmente: "La suma total de tierras de labrantío poseída y controlada en la actualidad por dicha demandada The Fajardo Sugar Company of Porto Rico, tanto por sí misma como por medio de sus subsidiarias o agentes arriba mencionadas, y en las que se dedica en la actualidad a la agricultura, según se ha dicho, monta a unos 23,800 acres."

La querella termina alegando que la tenencia y control por las querelladas de tierras concentradas en grandes fundos, son contrarios a la política pública de Puerto Rico y están en conflicto con el bienestar económico del pueblo de la Isla, con expresión de los hechos y circunstancias en que esa alegación se basa.

La Resolución Conjunta de que se ha hecho mérito se aprobó diez y ocho días después de haberse organizado el territorio de Puerto Rico por el Congreso de los Estados Unidos. Por su sección tercera, como consta publicada a la pág. XXXVI de los Estatutos Revisados y Códigos de Puerto Rico, 1902, ordena lo que sigue:

"Sección 3.—Que todas las franquicias, privilegios o concesiones otorgados de acuerdo con la sección 32 de dicha ley, estarán sujetos a enmiendas, alteraciones o revocaciones. En ellos se prohibirá la emisión de acciones u obligaciones, excepto cuando tal emisión se realice a cambio de dinero al contado, o de propiedades cuyo justiprecio sea igual al valor, a la par, de las acciones u obligaciones expedidas; se prohibirá la declaración de dividendos de acciones u obligaciones; y cuando se trate de sociedades para llenar un servicio público, se acordarán reglamentos eficientes que fijen los precios de dicho servicio; y en caso de compra o traspaso a las autoridades públicas de las propiedades pertenecientes a dichas sociedades, los reglamentos fijarán el precio en un valor justo y razonable. Ninguna sociedad estará autorizada para efectuar negocios de compra y venta de bienes raíces; ni se le permitirá poseer o tener dicha clase de bienes a excepción de aquellos que fuesen racionalmente necesarios para poder llevar adelante los propósitos a que obedeció su creación; y, en lo sucesivo, el dominio y manejo de terrenos de toda sociedad autorizada para dedicarse a la agricultura, estarán limitados, por sus estatutos, a una cantidad que no exceda de quinientos *acres; y*

esta previsión será adoptada para impedir a cualquier miembro de una sociedad agrícola que tenga interés de ningún género en otra sociedad de igual índole.''

La palabra ''corporation'' usada en el original inglés, se tradujo indebidamente por ''sociedad'' al castellano. Partiremos de la base de que la exacta traducción es ''corporación''.

La asamblea legislativa creada por la Ley Orgánica de abril 12, 1900, decretó el 1 de marzo de 1902 una ley estableciendo los procedimientos de *Quo Warranto* (Leyes de 1902, pág. 305, Comp. 1319–1327) y en 9 de marzo de 1911 otra titulada Ley para poner en vigor una ley de corporaciones privadas (Leyes de 1911, pág. 93, Comp. 407–471). Ambas leyes estaban vigentes a las fechas en que las corporaciones querelladas The Fajardo Sugar Company of Porto Rico y The Loíza Sugar Company se organizaron y comenzaron a negociar en esta Isla, y al amparo de la segunda fué la otra querellada admitida a realizar negocios en nuestra comunidad.

La sección 2 de la primera de dichas leyes dispone, en lo pertinente, que ''. . . cuando alguna corporación haga u omita algo que equivalga a la renuncia o a la pérdida de los derechos y privilegios que como tal corporación le correspondan; o cuando ejercitare derechos no conferidos por la ley, el Fiscal General o cualquier fiscal de la respectiva corte de distrito, ya obrando por su propia iniciativa, ya a instancia de otra persona, podrá presentar a la Corte de Distrito que tenga jurisdicción en el asunto, una petición de que se le admita una solicitud de que se abra una información de la naturaleza de un *'quo warranto'*, a nombre de El Pueblo de Puerto Rico. . .''

Y la 6 disponía:

''En caso de que alguna persona o corporación contra quien se haya hecho la petición resultare culpable la corte podrá dictar su fallo, despojando a dicha persona o corporación del cargo o franquicia a que se refiere la petición, y podrá multar a dicha persona o

corporación por la usurpación o desempeño ilegal de tal cargo, o de dicha franquicia, o su intrusión en él o en ella. y podrá también imponer al demandado el pago de las costas de las actuaciones. *Disponiéndose,* que en lugar de sentencia de despojo de franquicia, la corte podrá multar a la persona o corporación que resultare culpable, en una suma que no excederá de cinco mil dollars por cada falta.''

El artículo 3 de la Ley de Corporaciones Privadas, en lo pertinente, prescribe:

''Art. 3.—Toda corporación tiene facultades para:

''4: Adquirir y poseer, en cualquier forma legal, bienes raíces y muebles, y traspasar los mismos, conforme exigieren los fines consignados en las cláusulas de incorporación, así como hipotecar dichos bienes y sus privilegios; *Disponiéndose, sin embargo,* que la facultad de cualquiera corporación agrícola organizada bajo esta Ley, para poseer bienes raíces, estará sujeta a las prohibiciones establecidas en el Artículo 3 de la Resolución Conjunta del Congreso de los Estados Unidos, de mayo 1 de 1900.'' Leyes de 1911, p. 93.

Por eso esta corte al decidir que la cuestión de la posesión de tierras por corporaciones en una extensión mayor de quinientos acres no era propia para ser suscitada por un registrador de la propiedad y para ser considerada y resuelta dentro del recurso gubernativo interpuesto contra la nota del registrador, tras un estudio de la Ley Orgánica de 1900 y de la jurisprudencia, dijo:

''De modo que la ley dispone de manera suficiente las medidas necesarias que han de adoptarse para que cualquier infracción de la Ley Orgánica pueda ser completamente investigada y perseguida por el Fiscal General. Si existe alguna duda en cuanto al límite de la facultad que tiene el registrador, esta duda aparece enteramente resuelta por las disposiciones de la Ley Orgánica y el artículo 73 del Código Político. El Fiscal General es el único funcionario en quien reside el derecho a iniciar procedimientos sobre revisión de bienes o atacar el derecho que tiene una corporación a poseer bienes inmuebles. Sin tal procedimiento judicial o cuasi judicial, una corporación podría ser privada de algunos derechos de propiedad sin el debido procedimiento de ley.'' *Compañía Azucarera de la Carolina* v. *Registrador de San Juan,* 19 D.P.R. 152, 161.

Y por eso refiriéndose a ésa y a otras de sus decisiones: en igual sentido, recientemente expresó:

"Desde entonces, o sea desde hace más de veinte años, el Poder Judicial habló con toda claridad y mostró el camino. Los Poderes Ejecutivos y Legislativos Federales e Insulares y la Comunidad en general quedaron informados. Y es a ellos a quienes corresponde actuar." *Baetjer* v. *Registrador,* 48 D.P.R. 647, 666.

La Resolución Conjunta de 1900 está aún en todo su vigor. Al decretar el Congreso en 1917 la segunda Carta Orgánica de Puerto Rico (39 Stat. at Large, Part I, Chap. 145,. p. 951), que es la que rige en la actualidad, en el artículo 39 de la misma, ordenó:

"Nada de lo contenido en esta Ley será interpretado en el sentido de revocar o en alguna forma menoscabar o afectar la disposición contenida en la Sección 3 de la Resolución Conjunta aprobada en 1 de mayo de 1900, con respecto a la compra, venta o posesión de bienes inmuebles." Leyes de 1917, p. 55.

La Ley de *Quo Warranto* fué enmendada en 1931 (Ley núm. 37 de 1931, pág. 355) y en 1935. La enmienda de 1931 carece de importancia. En 1935 se dictaron dos leyes. La primera, la núm. 33, de julio 22, 1935 ( (2) pág. 419), copiada a la letra, en lo pertinente, dice:

"Ley para conferir al Tribunal Supremo de Puerto Rico jurisdicción original exclusiva en procedimientos de Quo Warranto que el Gobierno de Puerto Rico inicie por violación de las disposiciones de la sección 752 del Título 48 del Código de los Estados Unidos, y para otros fines.

*"Decrétase por la Asamblea Legislativa de Puerto Rico:*

"Sección 1.—Por la presente se confiere al Tribunal Supremo de Puerto Rico jurisdicción original exclusiva para conocer de todo procedimiento de *quo warranto* que el Gobierno de Puerto Rico inste en lo sucesivo por violación de las disposiciones de la Sección 752 del Título 48 del Código de los Estados Unidos, y al efecto se dispone que la violación de dichas disposiciones constituirá motivo bastante para que se inicie un procedimiento de la naturaleza de *quo warranto."*

La segunda, la 47, aprobada en agosto 7, 1935 ( (2) pág. 531), también copiada a la letra, en lo pertinente, dice:

"LEY para enmendar las secciones 2 y 6 de la 'Ley estableciendo los procedimientos del *Quo Warranto* aprobada en 1ro. de marzo de 1902', según fué enmendada por la Ley núm. 37, aprobada en 24 de abril de 1931, y para otros fines.

"*Decrétase por la Asamblea Legislativa de Puerto Rico:*

"Sección 1.—Que la sección 2 de la 'Ley estableciendo los procedimientos de *quo warranto,* aprobada en 1ro. de marzo de 1902', queda por la presente enmendada en la forma siguiente:

" 'Sección 2.—Cuando alguna persona usurpare o ilegalmente ejerciere o desempeñare funciones de algún cargo público o hiciere ilegalmente uso de alguna franquicia, . . . o cuando alguna asociación o número de personas actúen en Puerto Rico en concepto de corporación, sin estar incorporadas legalmente, o cuando alguna corporación haga u omita algo que equivalga a la renuncia o a la pérdida de los derechos y privilegios que como a tal corporación le corresponden; o cuando ejercite derechos no conferidos por la ley, el Fiscal General o cualquier fiscal de la respectiva corte de distrito ya obrando por su propia iniciativa, ya a instancias de otra persona, podrá radicar ante cualquier corte de distrito de Puerto Rico una solicitud para que se instruya información de la naturaleza del *quo warranto,* a nombre de El Pueblo de Puerto Rico; o cuando cualquier corporación por sí, o a través de cualquier otra entidad subsidiaria o afiliada o agente ejercite derechos o realice actos o contratos en contravención a las expresas disposiciones de la Carta Orgánica de Puerto Rico o de cualquiera de sus estatutos, el Fiscal General o cualquier fiscal de distrito, ya obrando por su propia iniciativa, ya a instancias de otra persona, podrá radicar ante el Tribunal Supremo de Puerto Rico una solicitud para que se instruya información de la naturaleza del *Quo Warranto* a nombre de El Pueblo de Puerto Rico; . . .

" ' 'Cuando cualquier corporación por sí o a través de cualquier otra entidad subsidiaria o afiliada o agente esté poseyendo ilegalmente, por cualquier título bienes inmuebles en Puerto Rico, El Pueblo de Puerto Rico podrá, a su opción, dentro del propio procedimiento, instar la confiscación de dichos bienes, a su favor, o su enajenación en subasta pública dentro de un término no mayor de seis meses a contar desde la fecha en que se dicte sentencia final.

" 'En todo caso la enajenación o confiscación se hará previa la indemnización correspondiente en la forma establecida en la Ley de Expropiación Forzosa.'

"Sección 2.—La Sección 6 de la referida Ley estableciendo los procedimientos de 'quo warranto', aprobada en 1ro. de marzo de 1902, queda por la presente enmendada del modo siguiente:

" 'Sección 6.—En caso de que alguna persona o corporación contra quien se haya hecho la petición resultare culpable, la corte podrá dictar su fallo, despojando a dicha persona o corporación del cargo o franquicia a que se refiere la petición, y podrá multar a dicha persona o corporación por la usurpación o desempeño ilegal de tal cargo, o de dicha franquicia, o su intrusión en él o en ella, y podrá también imponer al demandado el pago de las costas de las actuaciones; . . .

" 'En todos los casos en que quedare satisfactoriamente probado, a juicio de la corte que la corporación o corporaciones, han realizado actos o ejercitado derechos no conferidos por la ley, o en contravención a las expresas disposiciones de la misma, en la sentencia que recaiga, se decretará la disolución de la entidad demandada, si fuere doméstica, la prohibición de continuar haciendo negocios en el país, si fuere extranjera, la nulidad de todos los actos y contratos realizados por la corporación o entidad demandada, y se decretará, además, la cancelación de los asientos o inscripciones que los mismos hayan producido en los registros públicos de Puerto Rico, y cuando el decreto de nulidad afecte a bienes inmuebles y El Pueblo de Puerto Rico hubiere optado por su confiscación, o se ordenare la venta en pública subasta, la sentencia final fijará el precio razonable que deba pagarse por los mismos. A estos efectos deberá fijarse el justo valor de los bienes sujetos a enajenación o confiscación en la misma forma fijada en los casos de expropiación forzosa.

" 'La infracción de la orden prohibiendo hacer negocios después de dictada sentencia firme será penada con multa máxima de quinientos (500) dólares por cada día que la entidad continuare ejerciendo sus funciones, ejecutable en los bienes de la entidad, y las personas que las representan incurrirán en desacato a la corte, castigable con pena mínima de uno a seis meses de cárcel.

" 'Siempre que se pronuncie alguna sentencia a favor de algún demandado, éste podrá recobrar del demandante las costas, incluyendo una suma razonable para honorarios de abogado.

" 'A los fines de fijar el valor de los bienes El Pueblo de Puerto Rico, por conducto de sus agentes o representantes, queda autori-

zado para penetrar en las fincas o bienes objeto de controversia cualquiera que sea su naturaleza y condición.' ''

Tales son los hechos y las leyes envueltos en el caso.

El procedimiento a seguir fué marcado por el legislador. La jurisdicción de esta corte parece algo que no debería levantar dudas. Sin embargo, todo ha sido impugnado de manera tan complicada y laboriosa, que no ha sido tarea fácil volver a la primera impresión.

██ Sostiene la Fajardo Sugar Growers' Association, que no es una corporación y que no siéndolo no se le puede imputar violación de ley alguna porque sea dueña de o controle más de quinientos acres de tierra.

Admitiendo sin resolverlo que sea así, ello no obstante, dados los hechos que en la querella se alega que ha realizado, creemos que se encuentra debidamente ante la corte.

Si la corte tiene jurisdicción para juzgar los actos de las otras dos querelladas cuya naturaleza corporativa es indiscutible, también la tiene para juzgar los suyos, porque están según se alega tan entrelazados todos que constituyen una sola transacción.

Dados los términos de la querella, la entidad central violadora de la ley resulta ser la querellada The Fajardo Sugar Company of Porto Rico. Las querelladas The Fajardo Sugar Growers' Association y The Loíza Sugar Company son según la querella entidades subsidiarias suyas, constituyen las agencias usadas para controlar y poseer tierras en exceso de las permitidas por la ley y por sus propias cláusulas de incorporación, por su franquicia. Y en el estado actual del procedimiento a lo alegado en la querella debemos atenernos.

██ La querellada The Fajardo Sugar Company ataca de inconstitucionales las leyes núms. 33 y 47 de 1935, porque a su juicio enmiendan la resolución conjunta del Congreso de 1900 e invaden el campo legislativo reservádose por éste, porque la Legislatura de Puerto Rico no tiene facultad para imponer penalidades por violaciones de leyes de los Estados

Unidos, porque contienen más de un asunto y asuntos no claramente mencionados en el título, porque restablecen, enmiendan y dan mayor alcance a disposiciones de leyes de los Estados Unidos y de Puerto Rico sin decretar de nuevo y publicar en su totalidad dichas leyes, porque la 47 es una ley *ex post facto,* menoscaba el valor de los contratos y priva a la querellada del debido procedimiento de ley y porque ambas son de tal manera indefinidas que resultan nulas.

La querellada The Loíza Sugar Company levanta más o menos las mismas cuestiones sosteniendo además que la resolución conjunta del Congreso es anticonstitucional por discriminatoria y arbitraria.

Según la opinión que del caso hemos formado puede y debe prescindirse por ahora de estudiar y resolver todas las cuestiones suscitadas relativas a nuevas penalidades impuestas por las indicadas leyes, limitando nuestro estudio y resolución a la cuestión de si por ellas se confirió y pudo conferirse jurisdicción original a esta Corte Suprema para conocer de aquellos casos de *quo warranto* seguidos contra corporaciones que posean tierras en exceso de la extensión permitida.

Ordena la sección 34, párrafos 8 y 9 de nuestra Ley Orgánica que:

"No se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título; pero si algún asunto que no esté expresado en el título fuere incluído en cualquier ley, esa ley será nula solamente en aquella parte de ella que no haya sido expresada en el título.

"Ninguna ley será restablecida o enmendada, ni se dará mayor alcance a sus disposiciones, ni se conferirán las facultades en ella contenidas, haciendo referencia a su título solamente, sino que toda la parte de ella que sea restablecida, enmendada, extendida o conferida será decretada nuevamente y publicada en su totalidad."

Conocemos los títulos de las leyes núms. 33 y 47. El de la primera comienza así: "Ley para conferir al Tribunal Supremo de Puerto Rico jurisdicción original exclusiva en

procedimientos de *Quo Warranto*. . . .'' Es terminante. Y el de la segunda, como sigue: ''Ley para enmendar las secciones 2 y 6 de la 'Ley estableciendo los procedimientos de *Quo Warranto*. . . .' '' La enmienda incluye la jurisdicción. Substancialmente el precepto constitucional quedó cumplido.

Pero se insiste en que por la 33 la jurisdicción se confiere para conocer de las violaciones de una ley del Congreso y en que por la 47 se enmienda la indicada ley imponiendo penalidades, para lo cual no tiene facultades la Asamblea Legislativa Insular.

Que la Asamblea Legislativa de Puerto Rico no tiene facultades para invadir el campo de acción del Congreso, ni para enmendar ley alguna federal, es evidente. Por tanto, si las leyes 33 y 47 invadieran dicho campo o enmendaran la resolución conjunta de 1°. de mayo de 1900, no tendrían validez alguna. Pero a nuestro juicio en cuanto a la cuestión de jurisdicción se refiere, dichas leyes ni invaden el campo reservádose por el Congreso ni enmiendan su resolución conjunta indicada. Si es que lo invaden en cuanto a las nuevas penalidades, es cuestión separable que ya dejamos indicado que no precisa considerar por ahora.

Puerto Rico es un territorio perfectamente organizado. Posee gran parte de los atributos y puede compararse en varios extremos a un Estado de la Unión. Ejercitando sus poderes legislativos pasó la Ley de Corporaciones Privadas a que antes hicimos referencia, y a esa ley quedan sujetas las corporaciones que se organizan de acuerdo con la misma.

A Puerto Rico corresponde no sólo dictar como dictó leyes sobre corporaciones, si que vigilar su cumplimiento. De ahí que desde 1902 promulgara la ley estableciendo los procedimientos de *Quo Warranto*, ley conocida por las querelladas y a cuyos preceptos quedaron sometidas desde que fueron organizadas y comenzaron a actuar.

Alega la Loíza Sugar Company que ''la limitación surgente de la resolución conjunta de 1900 no se esfuma en las cláusulas locales de incorporación, ni pierde su origen, en-

tidad o naturaleza como restricción impuesta por el Congreso de los Estados Unidos.''

Es necesario reconocer que la limitación sobre dominio de tierras por parte de las corporaciones tuvo su origen en la resolución conjunta del Congreso, pero ese hecho como alega el querellante ''nada tiene que ver y no debe jamás confundirse con el conjunto de relaciones jurídicas que del mismo nacen, conjunto éste que es el que interesa a la solución de las cuestiones debatidas en este procedimiento. Dentro de los límites de la Constitución de los Estados Unidos (Constitución en el sentido amplio que incluye tradiciones de gobierno), debido a un finísimo ajuste, conviven, en sus respectivas esferas, un gobierno federal y los gobiernos de los estados y territorios sin rozamientos. Para conservar ese fino ajuste y la separación de las esferas, el gobierno federal se mira mucho antes de intervenir en los asuntos puramente locales de los estados y territorios. El gobierno federal, por ejemplo, no interviene jamás directamente en la reglamentación de las corporaciones creadas o autorizadas para hacer negocios por las soberanías estatales o territoriales.''

A los efectos de penetrarse bien de que en el caso de Puerto Rico se siguió la tradición norteamericana de gobierno, parece oportuno transcribir lo que dijo la Corte Suprema de los Estados Unidos por medio de su Juez Sr. Moody en *Martínez* v. *La Asociación de Señoras Damas del Santo Asilo de Ponce,* 213 U. S. 20, 23. Fué así:

''Por el tratado de paz (30 Stat. 1754), España cedió la isla de Puerto Rico a los Estados Unidos y renunció a toda soberanía sobre ella. Se dispuso cuidadosamente que la cesión no mermaría la propiedad, o los derechos correspondientes a las corporaciones, asociaciones o individuos. Artículo VIII. Sin embargo, es claro que desde entonces el deber de proteger la propiedad y los derechos dentro del territorio cedido corresponde a los Estados Unidos. Se dió la oportunidad a los súbditos españoles, naturales de la península, de conservar su fidelidad a la corona de España haciendo dentro de determinado período de tiempo una declaración a ese efecto. Artículo IX. Este artículo evidentemente no se refería a las corpo-

raciones. Ningún otro precepto del tratado parece pertinente a la cuestión que pende ante nos.

"Somos del criterio que la cesión de Puerto Rico por España a los Estados Unidos rompió todas las relaciones existentes entre España y esta corporación (la Asociación de Señoras Damas del Santo Asilo de Ponce) y que desde entonces no puede en forma alguna considerársele como ciudadana o súbdito español. España no tiene deber ni facultad sobre la misma.   .   .   .   .   .   .   .   .

"La siguiente cuestión es si la corporación demandante es ciudadana de Estados Unidos. Su *status* durante el período que medió entre la cesión y la aprobación de la ley para proveer un gobierno civil a la isla, no es necesario que se determine. Esa ley creó una forma de gobierno para Puerto Rico e islas adyacentes y en ella se exhibió con algunas modificaciones la separación característica americana de los poderes legislativo, ejecutivo y judicial.   .   .   .

.   .   .   .   .   .   .   .   .   .

el alcance del poder legislativo se describe plenamente en la sección 32, así:

" 'Que la autoridad legislativa estatuída por la presente, se aplicará a todos los asuntos de carácter legislativo que no sean localmente inaplicables, incluyendo la facultad de crear, consolidar y reorganizar los municipios, según fuere necesario, y proveer y derogar leyes y ordenanzas para los mismos; y también la facultad de alterar, reformar, modificar y derogar cualquiera o todas las leyes y ordenanzas, de cualquiera clase, actualmente vigentes en Puerto Rico o en cualquier municipio o distrito y que no se opusieren a lo prescrito aquí; *Disponiéndose, sin embargo,* que toda concesión de franquicias, derechos y privilegios, o concesión de carácter público o cuasi público, será otorgada por el Consejo Ejecutivo, con la aprobación del Gobernador, y toda franquicia concedida en Puerto Rico será comunicada al Congreso, el cual se reserva por la presente la facultad de anularla o modificarla.''

"En la forma de gobierno, que es típicamente americana, la creación y dirección de las corporaciones es función exclusivamente legislativa. Somos del criterio que el efecto de la carta orgánica es conferir tal función, en lo que se refiere a una corporación de la índole de la que está ante nos, cuyas características esenciales es innecesario repetir, al gobierno de Puerto Rico; y que tal corporación hoy en día, de ser un ciudadano de algún país, lo es de Puerto Rico. No es necesario que consideremos si la corporación tiene una existencia más que *de facto,* sujeta a la voluntad de la legislatura de Puerto Rico.''

Lo resuelto por la Corte Suprema sigue siendo aplicable después de la aprobación de la segunda carta orgánica, pues lo que por ella hizo el Congreso fué continuar llevando a la práctica su claro pensamiento de establecer en esta Isla una forma de gobierno típicamente americana.

Con esa norma por guía, creemos que asiste la razón al querellante cuando sostiene, refiriéndose a la resolución conjunta del Congreso, que "es un estatuto de naturaleza puramente constitucional, una enmienda a nuestra carta orgánica que no tiene otra función y alcance que limitar el poder delegado a nuestra legislatura de crear y reglamentar las personas jurídicas dedicadas a la agricultura."

Como una indicación de que el Congreso se reservó la facultad de reglamentar su prohibición, se insiste por las querelladas en lo dispuesto por él mismo en la segunda parte del párrafo segundo del artículo 39 de la Ley Orgánica de 1917, a saber:

"El Gobernador de Puerto Rico dispondrá que se tenga preparado y se someta al Congreso en la legislatura que principiará el primer lunes de diciembre de 1917, un informe de todos los bienes inmuebles usados para fines agrícolas y poseídos, bien directa o indirectamente, por corporaciones, sociedades o individuos, en cantidades que excedan de quinientos acres."

Sin embargo, es lo cierto que la enmienda originalmente ofrecida y que fué adoptada por el Senado contenía al final de la sección 39 la siguiente disposición: "Que el derecho de legislar ulteriormente sobre la materia queda reservado al Congreso." (Congressional Record, February 10, 1917, p. 3385). No se mostró conforme la Cámara. Se avino el Senado. (Id. February 23, p. 3995). Y la disposición fué eliminada y la ley aprobada en la forma que conocemos.

La resolución provee:

". . . y, en lo sucesivo, el dominio y manejo de terrenos de toda corporación autorizada para dedicarse a la agricultura, estarán limitados, por su carta constitutiva, a una cantidad que no exceda de quinientos acres; . . ."

Toda la Carta Orgánica demuestra que el Congreso estaba estableciendo una forma territorial de gobierno con el mismo control sobre las corporaciones creadas por él o haciendo negocios dentro de sus límites, que el que pudiera tener un estado o cualquier otro territorio. Por consiguiente, ya que las franquicias son concedidas por Puerto Rico y su gobierno tiene control sobre las corporaciones dentro de sus límites, la inferencia inevitable es que la violación de la franquicia o la tenencia de tierras en exceso de quinientos acres es una cuestión local. Es inconcebible que la violación de una carta constitutiva o de la carta orgánica debiesen ser excluídas del control de Puerto Rico. Sería tan posible decir que una violación de la llamada "Declaración de Derechos" es materia exclusivamente de jurisdicción federal, y así sucesivamente, de cualquier otra disposición de la carta orgánica.

La cuestión de si la Legislatura Insular pudo conferir a esta Corte Suprema jurisdicción original, la consideramos resuelta en sentido afirmativo por la ley y la jurisprudencia. Artículo 40 de la Ley Orgánica de 1917. *Municipality of Ponce* v. *Roman Catholic Church*, 210 U. S. 296.

El caso de *Ferris* v. *Higley*, 87 U. S. 375 invocado por la querellada The Fajardo Sugar Company no altera nuestro criterio. Ha sido ampliamente analizado y discutido por el querellante en su segundo alegato, págs. 10 a 16 del mismo y 783 a 789 del récord. Nada tenemos que agregar.

Y con respecto a que la Legislatura de Puerto Rico no puede privar a la Corte Federal de jurisdicción, bastará decir que el hecho de que por la Ley núm. 33 se confiera jurisdicción exclusiva a esta Corte Suprema, no puede ni debe interpretarse en el sentido de menoscabar la jurisdicción concurrente que pueda tener la Corte Federal. Dicha palabra dentro de una correcta interpretación se extiende únicamente a aquellas cortes sobre las cuales tiene facultad organizadora y reorganizadora la Legislatura o sean las cortes insulares. Las leyes deben interpretarse con el espíritu de darles vida,

a menos que violen en realidad de verdad la ley suprema, la constitución.

■ Por último y sin entrar en detalles y argumentos minuciosos, diremos que a nuestro juicio no es discriminatoria ni arbitraria en sí misma y de tal modo que resulte anticonstitucional la Resolución Conjunta del Congreso de mayo 1, 1900.

Al constituir la Isla de Puerto Rico en un territorio organizado, pensó el Congreso que dada su extensión territorial, podrían ser acaparadas sus tierras por una o varias poderosas corporaciones y estimando que ello sería dañoso para su futuro desenvolvimiento, fijó su política sobre la materia marcando un límite a las facultades de la naciente legislatura que había de tener a su cargo la adopción de leyes sobre corporaciones.

Las corporaciones pueden ser limitadas por una constitución. No podemos ver, especialmente en una comunidad agrícola, que la limitación en el número de acres a ser controlado por una corporación dedicada a la agricultura o que la prevención de un monopolio agrícola, constituyan un discrimen injusto. Y nada se nos ha citado para demostrarnos que el libre privilegio existente en cuanto a otras personas o corporaciones ocasiona un perjuicio.

Podrá discutirse si el límite de quinientas cuerdas estuvo o no bien seleccionado, pero no que sea irrazonable. Si se separa el negocio industrial del agrícola, puede concebirse que se establezcan corporaciones que levanten y sostengan en actividad grandes fábricas que transformen en azúcar las cañas que independientemente cultiven decenas o centenares de personas y corporaciones que a ello se dediquen ocupándose directamente de sus fincas, desarrollando actividades y multiplicando el número de ciudadanos y familias eficientes que se sostengan a sí mismos y que constituyen en los países bien organizados la base más segura y estable de una vida normal y ordenadamente progresiva.

El hecho de que para las corporaciones dedicadas a la agricultura se fijara un límite exacto—quinientas cuerdas—

dejándose la determinación del de las otras corporaciones al racionalmente necesario para llevar adelante sus propósitos, no implica discrimen.

Difícilmente se concibe que las otras corporaciones lleguen a necesitar quinientas cuerdas de terreno para el establecimiento de sus fábricas, para el desarrollo de sus negocios, pero tal vez alguna dedicada por ejemplo a la explotación de minas tuviera la necesidad de extenderse como consecuencia de sus investigaciones a más y en tal caso sí que sería irrazonable destruir la unidad de la explotación a virtud de una limitación fijada de antemano.

*Por virtud de lo expuesto y por todo lo que surge de los autos mismos, deben desestimarse las objeciones interpuestas por las querelladas a la jurisdicción de esta corte y ordenarse que el caso siga tramitándose de acuerdo con la ley.*

El Juez Asociado Sr. Córdova Dávila no se encuentra presente en el momento en que se lee y adopta la opinión que fundamenta esta resolución ni ha tenido la oportunidad de leerla, pero sí asistió a la vista final en que la cuestión de jurisdicción fué informada e intervino en la discusión del asunto en el seno del Tribunal y estoy autorizado por él para hacer constar que está conforme en que esta Corte tiene jurisdicción. El Juez Asociado Sr. Travieso no intervino.