OTTO GRIMMER, Appellant, *v.* THE TENEMENT HOUSE
  DEPARTMENT OF THE CITY OF NEW YORK et al.,
  Respondents.

Statutes — repeal by implication — a special statute is not
repealed by a subsequent general statute unless the intent to
repeal is manifest — New York (city of) — Building Code —
distinction between "apartment house" and "tenement house."

1. Repeals by implication are not favored and will not be declared
on the ground of inconsistency or repugnancy unless the same is
plain and unavoidable. A special statute providing for a particular
class of cases is not repealed by a subsequent statute, general in its
terms, provisions and application, unless the intent to repeal it is
manifest, although the terms of the general act are broad enough
to include the cases embraced in the special law.

2. An apartment house as defined by the Building Code, adopted
by the municipal assembly of the city of New York in 1899, differs
from a tenement house in three important particulars. Each apart-
ment must have a separate water closet and set bath tub, the latter
not being at all required in the tenement house, and the former only
n certain cases. It also must have a separate room or "kitchen,"
presumably for preparing and cooking food, whereas, in the case of
the tenement house, these operations may be conducted in a room
also used for sleeping, living or any other purpose.

3. The Building Code, adopted in 1899, under the provisions of
chapter 378 of the Laws of 1897, so far as it related to apartment
houses, was in force on the 1st day of January, 1902. The effect of
chapter 466 of the Laws of 1901 was to reaffirm it as it had been
adopted, and had the effect of ratifying and continuing a definition
of an apartment house which differentiated it from a tenement
house, as the latter was defined and regulated by the Tenement
House Act, and placed it outside the operation of said act. Hence
a building coming under that definition of an apartment house is
not subject to the supervision of the tenement house department.

*Grimmer* v. *Tenement House Department,* 134 App. Div. 896, ·
reversed.

(Argued January 18, 1912; decided February 13, 1912.)

APPEAL from an order of the Appellate Division of the
Supreme Court in the first judicial department, entered

January 28, 1910, reversing a judgment in favor of plaintiff entered upon the report of a referee and granting a new trial.

The action was brought by plaintiff to restrain the defendants from seeking to enforce the provisions of the Tenement House Act (Laws of 1901, chap. 334) against plaintiff's building, planned and erected in 1901. This building was located on East 31st street, between Lexington and Fourth avenues, in the city of New York, and is claimed by plaintiff to be an apartment house with certain hotel features and not to be a tenement house within and subject to the provisions of said Tenement House Act which defendants threaten to enforce. It is conceded that if the building is a tenement house it offends against the provisions of said act, and that this action should not be maintained.

The referee among other things found the following facts descriptive of said building:

It is of steel construction, front walls of stone and brick, the remaining exterior wall being of brick, all laid in Portland cement. The interior partitions were constructed of cement reinforced with steel. The floors were constructed of cement laid upon terra cotta arches, upon which were laid parquet floors of oak. The entrance hall has floor dimensions of about ten by eleven feet. The elevator, stairway and entrance to the apartments on the first floor are reached directly from this entrance hall. The walls of the entrance hall are covered with imported Vienna marble; the floors with white Italian marble; the ceilings and cornices are decorated in metal; the apartments on the first floor west and upon each of the floors above the first floor are arranged in suites; each suite has a private hall running from the elevator to the rear; every suite of apartments contains a drawing room, library, bathroom with set bathtub and toilette, three sleeping rooms, a serving room or kitchen, and servant's toilette. The serving rooms or kitchens contain gas

ranges and a sink.   There are rear fire escapes from each
suite consisting of an outside staircase.   A dumb waiter
extends from the public kitchen on the first floor east
directly to each suite of apartments.   Each suite of
apartments has a telephone and is lighted with electric
light.   There is a telephone exchange on the first floor,
which is attended by a telephone operator.   The elevator
extends from the entrance hall in each apartment and is
run night and day, being attended by elevator boys.   The
parlors, drawing rooms and libraries are furnished in
mahogany; the bedrooms are of white American oak
with a wainscoating; the walls of the drawing rooms,
libraries and sleeping rooms are covered with fine wall
paper; the walls of the dining rooms and private halls
are covered with fabric; the walls and floors of the
bathrooms are tiled.   There was upon August 31, 1906,
and now is upon the first floor of said building a
public reception room, a public office and a public din-
ing room, the latter having a floor space of twenty
by fifteen feet, a butler's pantry and a kitchen, the
kitchen being furnished with a large range and sink.
The public dining room aforesaid is intended and used for
supplying food to residents of the building and guests
and is open from seven o'clock in the morning until ten
o'clock at night every day, and meals are constantly
served therein, not only to occupants of the building, but
to others desiring such accommodation, and an average
number of meals of from thirty to forty have been served
in said dining room daily.

The building is intended for and used as the home and
residence of more than three families or households liv-
ing independently.   There are two separate apartments
on each floor above the first one.   It is intended, designed
and used for sheltering permanent residents or guests and
contains more than fifteen sleeping rooms above the first
story.

In addition to the facts so found it appears from a pho-

tograph of the building that it was eight stories in height, and as bearing somewhat upon its cost that there was a mortgage of over one hundred thousand dollars thereon and that some of the apartments rented for fifteen hundred dollars per annum.

*Martin S. Lynch* for appellant. The tenement house department has no jurisdiction over "The Dunsbro." (L. 1867, ch. 908; L. 1901, ch. 334; L. 1901, ch. 466; *White* v. *Collins Building,* 82 App. Div. 1; *Kitching* v. *Brown,* 180 N. Y. 414.) Section 9 of the Building Code was not repealed, nor was it modified by the New Tenement House Act. (*Kitching* v. *Brown,* 180 N. Y. 414.)

*Archibald R. Watson, Corporation Counsel* (*Terence Farley* and *John P. O'Brien* of counsel), for respondents. The conclusion reached by the learned referee, upon which the judgment was based, that the plaintiff's building was not a tenement house within the meaning of the Tenement House Act on the 31st of August, 1906, which is the date of the vacating order, is not supported by the facts. (*Tenement House Dept.* v. *Moeschen,* 179 N. Y. 325; *People ex rel. Cohen* v. *Butler,* 125 App. Div. 384.) With regard to section 9 of the Building Code, defining an apartment house, we contend (1) that the board of aldermen had no power to enact it; (2) that it was repealed by the Tenement House Act, and (3) that it was not confirmed by section 407 of the revised charter. (L. 1897, ch. 378, § 647; L. 1901, ch. 466.)

HISCOCK, J. The plaintiff is seeking to prevent the defendants from enforcing against his building the provisions of the Tenement House Act applicable to the city of New York. He urges that the latter is an apartment house or apartment hotel subject to the provisions of the Building Code and not a tenement house subject to the provisions of said first-mentioned act. If

his contention in this respect is wrong then concededly his building violates the law and this action cannot be maintained.

Thus we have presented the important and difficult question whether for purposes of supervision and regula-tion in the city of New York a class of modern resi-dential buildings popularly and somewhat indefinitely known as apartment houses, and perhaps fairly typified by plaintiff's building, may be and have been distin-guished from the buildings covered by the much older term and designation of tenement houses. The impor-tance of the question is found, if nowhere else, in the more detailed, rigorous and punitive nature of the pro-visions which by the Tenement House Act are made appli-cable to whatever buildings are to be classified as tenement houses. Its perplexity is evidenced somewhat at least by the circumstance that in this case in elaborate and most carefully considered opinions the learned referee and Appellate Division have reached diametrically opposing conclusions.

The disposition of the question whether plaintiff's build-ing is a tenement house involves an examination of legislation and legislative definitions.

So early as 1867 the necessity of compelling greedy and indifferent landlords, especially in New York city, to observe reasonable regulations of safety, health and decency for the benefit of tenants who were frequently too dependent or ignorant themselves to exact such condi-tions, led to the passage of "An act for the regulation of tenement and lodging houses in the cities of New York and Brooklyn." (Chap. 908.)

Chapter 334 of the Laws of 1901, known as "An act in relation to tenement houses in the cities of the first class," extended and perfected theretofore existing enactments for the supervision of such tenement houses in the interest of public welfare. It substantially continued the defini-tion of a tenement house as first employed in the act of

1867, providing (§ 2, subd. 1) : "A tenement house is any house or building, or portion thereof, which is rented, leased, let or hired out, to be occupied, or is occupied as the home or residence of three families or more living independently of each other, and doing their cooking upon the premises, or by more than two families upon any floor, so living and cooking, but having a common right in the halls, stairways, yards, water closets or privies, or some of them." Section 95 of said act further provided: "In every tenement house hereafter erected there shall be a separate water closet in a separate compartment within each apartment, provided that where there are apartments consisting of but one or two rooms, there shall be at least one water closet for every three rooms."

Section 647 of the revised charter of the city of New York (Laws of 1897, chap. 378) authorized the municipal assembly of that city "to establish and from time to time to amend a code of ordinances, to be known as the 'building code,' providing for all matters concerning, affecting, or relating to the construction, alteration, or removal of buildings or structures erected or to be erected in the City of New York." Pursuant to such power in 1899 the municipal assembly did adopt an ordinance known as the "Building Code."

In the meantime there had come into common existence and use in the city of New York what was widely and popularly known as the apartment house, intended like the tenement house to accommodate many unrelated tenants. It may be admitted that the older term tenement house in its broadest and most generic meaning as a dwelling or place of habitation would include this newer class of buildings, and that at times a very narrow margin or perhaps no margin at all would separate what was labeled an apartment house from one which was marked by the other designation. Nevertheless, dealing with types, both in popular conception and by judicial decision, the two classes of buildings were distinguished and differentiated.

Without going too much into detail it may be stated that the typical modern apartment house was regarded as possessing more pretentious architectural finish, more expensive and elaborate construction and conveniences than were possessed by the average tenement house. And it may be added as a proper sequence to this view that naturally they would be inhabited by a class of tenants who would be more independent and better able to exact proper living conditions without the help of such drastic provisions as are found in the Tenement House Act. (*Kitching* v. *Brown*, 180 N. Y. 414.)

Influenced as it may be assumed by these views when the municipal assembly framed the Building Code above provided for it left the supervision and regulation of apartment houses with the building department rather than the tenement house department, and to this end it gave a specific definition to such buildings which ran as follows: '' An apartment house shall be taken to mean and include every building which shall be intended or designated for, or used as, the home of three or more families or households, living independently of each other, and in which every such family or household shall have provided for it a kitchen, set bath tub and water closet, separate and apart from any other. Any such building hereafter erected shall not cover any greater percentage of a lot than is lawful to be covered by a tenement house, and the requirements for light and ventilation for a tenement house shall also apply to an apartment house."

Considering simply the indispensable requisites in the definitions we perceive that an apartment house differs from a tenement house in three important particulars. Each family or household must have a separate water closet and set bath tub, the latter not being at all required in the tenement house and the former only in certain cases. It also must have a separate room or "kitchen," presumably for preparing and cooking food, whereas in the case

of the tenement house these operations may be conducted in a room also used for sleeping, living or any other purpose.

These seem to be distinguishing features of substance. The description of plaintiff's building shows how far the apartment house is liable to be developed beyond the essential requirements specified in this definition.

Chapter 466 of the Laws of 1901 (Section 407) provided: " The building code which shall be in force in the city of New York on the first day of January, 1902, and all then existing provisions of law fixing the penalties for violation of said Code, and all then existing laws affecting or relating to the construction * * * of buildings * * * within the city of New York are hereby declared to be binding and in force * * * except," etc. Therefore, if the provision of the Building Code already quoted defining an apartment house was "in force in the City of New York on the first day of January, 1902," the statute in question had the effect of expressly ratifying and adopting and continuing a definition of an apartment house which differentiated it from a tenement house as the latter was defined and regulated by the Tenement House Act, and placed it outside the operation of said act.

It is urged, however, that the definition of an apartment house in the Building Code was not thus continued by this act for the reason that it was not "in force" when said act was passed, but had been repealed by the Tenement House Act of 1901, which took effect a few days before the statute last quoted from and which provided, "All statutes of the state and ordinances of the city so far as inconsistent with the provisions of this act are hereby repealed," etc.

I think that this contention is not well founded. In the first place, I doubt that we could say that the differences between the tenement house as defined by the Tenement House Act and the apartment house as defined by the Building Code and which have been pointed out are

so unsubstantial and shadowy that the former act should be regarded as repealing by implication for inconsistency the provisions of the code on the theory that the latter attempted to define as an apartment house what was defined in the statute as a tenement house. There is no express repeal and it is familiar law that even under ordinary circumstances repeals by implication are not favored and will not be declared on the ground of inconsistency or repugnancy unless the same is plain and unavoidable. (*People ex rel. Woods* v. *Crissey*, 91 N. Y. 616; *Mark* v. *State of New York*, 97 id. 572.)

But in this case the rule against repeal by implication is even stronger than the ordinary one, since the Tenement House Act was a general one whereas the Building Code was in effect a special act applicable only to New York city. The rule in such case is that a special statute providing for a particular class of cases is not repealed by a subsequent statute general in its terms, provisions and application unless the intent to repeal it is manifest, although the terms of the general act are broad enough to include the cases embraced in the special law. (*City of New York* v. *Trustees Sailors' Snug Harbor*, 85 App. Div. 355; affirmed on opinion below, 180 N. Y. 527.)

But even if this view is incorrect, I further believe that when the act of 1910 provided that the Building Code, which should "be in force  *  *  *  on the 1st day of January, 1902," should "continue to be so binding and in force" it was intended to include and reaffirm the Code as it had been written, adopted and continued in force by the municipal assembly which had been especially intrusted with the duty of framing it; that while it may be assumed, so far as this case is concerned, that such legislative reaffirmation would have been subject to any direct and clear modification, by the legislature, of the Building Code, it reasonably could not have been intended to be subject to such indirect, implied and obscure modification as might be spelled out of some general statute,

This principle seems to have been applied in *People ex rel. Lieberman* v. *Vandecarr* (175 N. Y. 440). The court there had before it for consideration a provision of the Sanitary Code of New York city. Authority to enact such a code was given to the board of health of the city of New York by chapter 335, Laws of 1873. The power was continued by the Consolidation Act, which provided that no alteration or amendment of the code should take effect or be binding until the same should have been published in a given manner. This limitation on the power of revision, alteration or amendment was continued in section 1172 of the Greater New York charter. The ordinance relied on in the case in question had been adopted by the board of health in 1896, but it had never been published as above provided. Under these conditions section 1172 of the Greater New York charter provided in substance that the Sanitary Code adopted in 1873, " as amended in accordance with law," should continue to be binding and in force in the new city. Notwithstanding the dissenting opinion of Judge CULLEN that, "since the section under discussion was not valid nor in force at the time of the enactment of these two statutes, neither statute assumed to render it legal or give it validity," the contrary view prevailed that the section in question was "recognized and adopted " by section 1172 as just quoted.

Thus, we reach the conclusion that the definition of an apartment house originally found in the Building Code has been preserved, and that a building coming within that definition is not subject to the supervision of the tenement house department.

In reaching such conclusions we do not overlook the fact that the tenement house commission, by their report to the legislature and called to our attention by the learned Appellate Division, seemed to favor putting all buildings, whether known as tenement houses or as apartment houses, under the jurisdiction of the tenement house department, and of course we do not overlook

the fact that a landlord who so desires may by a comparatively short and easy course avoid the Tenement House Act and bring himself and his building within the jurisdiction of the building department.

Aside from the fact that proper principles of construction fairly compel us to adopt these conclusions, they have the practical advantage of recognizing a definite test by which to decide whether a building does or does not come under the Tenement House Act. As was said in the *Kitching* v. *Brown* case, and as must be practically conceded, very many of the provisions of that act are inapplicable or unnecessary in the case of the average apartment house. Under the power given to the municipal assembly to enact and amend a Building Code there is no reason why apartment houses should not be subjected to the most complete and unyielding supervision and regulation which public welfare can possibly require, even though they are not covered by the Tenement House Act. Furthermore, if the definition which we have held to be controlling in determining whether a building is or is not a tenement house is unsatisfactory, it lies with the legislature to prescribe some new and more satisfactory test.

So far as the particular building involved in this action is concerned it is clear that under the views which we have expressed it is not a tenement house and not within the jurisdiction of the tenement house department, and that, therefore, the order of the Appellate Division holding to the contrary should be reversed and the judgment on the report of the referee affirmed, with costs in both courts.

CULLEN, Ch. J., GRAY, HAIGHT, VANN, WERNER and COLLIN, JJ., concur.

Order reversed, etc.