El Pueblo de Puertó Rico, querellante, *v.* Rubert Hermanos, Inc., querellada.

Núm. 2.—*Sometido:* Abril 23, 1938. *Resuelto:* Julio 30, 1938.

*Hon. Procurador General B. Fernández García, M. Guerra-Mondragón, R. Rivera Zayas* y *Lester P. Schoene,* abogados del querellante; *Jaime Sifre, Jr., Horacio Franceschi* y *Orlando Antonsanti,* abogados de la querellada.

EL JUEZ ASOCIADO SEÑOR TRAVIESO emitió la opinión del tribunal.

El propósito del presente recurso de *Quo Warranto* es juzgar el derecho y título de la querellada Rubert Hermanos,

Inc., a continuar haciendo negocios como corporación en la Isla de Puerto Rico. Los hechos esenciales, según fueron alegados en la querella enmendada de El Pueblo de Puerto Rico, son como sigue:

Rubert Hermanos, Inc., es una corporación organizada bajo las leyes de Puerto Rico, cuyas cláusulas de incorporación, archivadas en abril 27, 1927, proveen lo siguiente:

"Sección 4.—Los fines y propósitos para los cuales y para cualquiera de los cuales se forma y constituye la corporación son los de realizar todas o cualesquiera de las cosas que más adelante se mencionan al igual y con el mismo alcance que podían hacerlo personas naturales, a saber:

"(a) Dedicarse en la Isla de Puerto Rico o en cualquier otra parte a la fabricación de azúcares, mieles y demás productos derivados del azúcar.

"..

"(c) Construir, comprar, poseer, arrendar o en cualquier otra forma adquirir y fomentar, promover, organizar, manejar, dirigir y administrar empresas cuyo fin y objeto sean la siembra, cultivo y recolección de cañas de azúcar y la manufactura y venta de azúcares, tanto refinados como crudos, mieles y demás productos derivados del azúcar, y construir, comprar, poseer o en cualquier forma adquirir centrales, molinos, establecimientos y fábricas con todos los edificios, instalaciones, dependencias, accesorios e implementos necesarios o convenientes para la manufactura y elaboración de azúcares, mieles y demás productos derivados del azúcar....

"(d) Dedicarse a la agricultura en general. Sembrar, cultivar y recolectar plantaciones de caña de azúcar, explotando en esa forma o en la que estime conveniente con uso de abonos y riegos, ya directamente, ya por medio .de arrendatarios o colonos, las tierras que.posea; comprar, vender y en cualquier forma comerciar en caña de azúcar

"(f) Comprar, tomar en arriendo, poseer o en cualquier otra forma adquirir, vender, permutar y traspasar o en cualquier otra forma disponer de propiedad inmueble, derechos reales, fincas y plantaciones situadas en o fuera de la Isla de Puerto Rico hasta donde esto fuese racionalmente necesario para poder llevar adelante los fines y propósitos para los cuales se constituye y organiza la corporación; *disponiéndose, sin embargo, que el derecho de la corporación a poseer y controlar tierras en la Isla de Puerto Rico estará*

*limitado a quinientos acres solamente, y sujeto a las restricciones establecidas en el artículo tercero de la Resolución Conjunta de mayo 1 de 1900, aprobada por el Congreso de los Estados Unidos de América."* (Itálicas nuestras.)

Se alega en la querella que en violación de las precedentes disposiciones de sus artículos de incorporación y del artículo tercero de la Resolución Conjunta núm. 23 (31 Statutes at Large 716, U. S. C. A., Título 48, sección 752) la corporación demandada ha adquirido y es ahora la dueña con título en pleno dominio de varias parcelas de tierra con un área en exceso de quinientos acres, cuyas tierras son usadas por la corporación demandada para sembrar, cultivar y cosechar caña de azúcar; y que las tierras así poseídas, controladas y usadas por la corporación demandada tienen un área de 12,188 acres.

En la querella se solicita sentencia en que se declare cancelada la franquicia de la demandada, se ordene la inmediata disolución de la corporación demandada, prohibiéndole seguir haciendo negocios en Puerto Rico, y se condene a dicha demandada a pagar una multa, con los demás pronunciamientos que en equidad y justicia sean pertinentes.

Declaradas sin lugar por esta corte en julio 13 de 1937 una moción para eliminar ciertas partes de la querella enmendada, radicada en marzo 16, 1937 (51 D.P.R. 939), y una excepción radicada el mismo día (51 D.P.R. 940), la corporación demandada radicó su contestación a la querella en agosto 19, 1937.

La contestación de la demandada, que en efecto es una alegación *in confession and avoidance,* levanta las siguientes defensas específicas:

1. La demandada admite que fué incorporada con el propósito, entre otros, de dedicarse a la agricultura, siembra de caña, tenencia, compra y posesión de tierras y plantaciones; pero alega, que los dichos no son todos los fines y propósitos para los cuales fué incorporada y que por sus artículos de incorporación la corporación demandada estaba también au-

torizada para dedicarse a la manufactura de azúcar, mieles y otros derivados de azúcar de caña, y para comprar, vender y generalmente comerciar en azúcar y sus derivados.

2. Que la limitación de quinientas cuerdas a que se refiere el párrafo (f) de la sección 4 de los artículos de incorporación de la demandada y contenida en el artículo 3 de la Resolución Conjunta de mayo 1 de 1900, es aplicable tan sólo para el caso de que la corporación demandada quisiera dedicarse a la agricultura como objeto principal; y que las demás restricciones de dicha Resolución Conjunta de que se hace mención, son aplicables a la corporación demandada en el ejercicio por ella del objeto de manufacturar azúcar, que es un objeto industrial, y tales restricciones le prohiben tener o poseer bienes raíces a excepción de aquéllos que fuesen racionalmente necesarios para poder llevar adelante los propósitos a que obedeció su creación.

3. Que entre los varios propósitos para los cuales se incorporó y para los cuales fué autorizada por su franquicia, la corporación demandada escogió como su objeto principal la industria de fabricar y producir azúcares y mieles para vender en la Isla y en los Estados Unidos, para cuyo propósito adquirió la factoría azucarera conocida por "Central San Vicente", que ha sido equipada para moler hasta 350,000 toneladas de azúcar en cada zafra; que con el fin de obtener y asegurarse de la materia prima indispensable para poder dedicarse a la manufactura de azúcar, la corporación demandada, haciendo uso de una facultad incidental o implícita, adquirió también las tierras racionalmente necesarias para obtener de ellas, mediante la siembra y cultivo de caña de azúcar, parte de la caña de azúcar que necesita moler en cada zafra en su industria de fabricación de azúcar y mieles; y que las tierras así adquiridas no le proporcionan todas las cañas que necesita en cada zafra la factoría de la demandada; que la querellada no podría dedicarse a la industria de manufacturar azúcar si tuviera que depender enteramente de las cañas que pudiera adquirir de otros; que para poder

operar su empresa azucarera económica y eficientemente, la corporación demandada necesita sembrar y suplirse de una gran parte de la caña a ser molida en cada zafra, y que las tierras de que es dueña en la actualidad son las que indispensable y racionalmente necesita para producir parte de la materia prima que necesita; y que al hacer lo anterior la demandada no ha violado en forma alguna su franquicia ni disposición alguna de la Resolución Conjunta de mayo 1 de 1900.

4. Admite la querellada que es dueña y controla 12,188 cuerdas de tierra; pero niega que se dedique a la agricultura en tales tierras, como fin u objeto principal corporativo. Y alega en contrario que dedica parte de dichas tierras a obtener de las mismas mediante la siembra y cultivo las cañas que la corporación demandada necesita en su industria de manufactura de azúcar y mieles, cuya manufactura es el fin u objeto primordial de la corporación demandada y al que se ha dedicado desde que comenzó a hacer negocios.

5. La demandada niega que la tenencia o control por ella de una extensión de tierras tan vasta sea contraria a política pública alguna del Pueblo de Puerto Rico y niega asimismo que tal tenencia o control esté en conflicto con el bienestar económico del pueblo de esta Isla.

6. Que la Resolución Conjunta restringiendo la tenencia o control de tierras por corporaciones fué aprobada por el Congreso en el año 1900; que desde entonces y hasta recientemente varias corporaciones han sido organizadas en Puerto Rico con el propósito de dedicarse al negocio de manufacturar azúcar y muchas de dichas corporaciones adquirieron tierras en exceso de quinientas acres con el propósito de obtener de las mismas la caña necesaria para la manufactura de azúcar y mieles; que El Pueblo de Puerto Rico toleró, consintió y fomentó el desarrollo de la industria azucarera a través de todos esos años, sin haber iniciado nunca procedimiento alguno para impugnar u objetar el derecho de una corporación azucarera a tener o controlar más de

quinientos acres, siempre que la tenencia o control de tales tierras fuera razonablemente necesario para la producción de las cañas requeridas en la manufactura de azúcar; que El Pueblo de Puerto Rico ha cobrado y aún cobra contribuciones sobre las propiedades de dichas corporaciones y que por mediación de sus funcionarios, departamentos y otras agencias gubernamentales siempre tuvo o pudo haber tenido conocimiento de las tierras adquiridas por las corporaciones que así se dedicaban a la manufactura de azúcar; y que a pesar de esos hechos, no fué hasta el año 1935 que El Pueblo de Puerto Rico instituyó por primera vez procedimientos para impugnar el derecho de las referidas corporaciones a poseer más de quinientos acres de tierra para los fines industriales antes indicados.

7. Que la corporación demandada adquirió la central o factoría de azúcar y casi la totalidad de las tierras que ahora posee o controla en el año 1927; que desde esa fecha ha utilizado dichas factoría y tierras en el negocio de manufacturar azúcar y mieles, obteniendo de esas tierras parte de las cañas requeridas para su referido negocio de fabricación de azúcar; que durante todo ese tiempo la querellada ha actuado abierta y públicamente, teniendo todas esas tierras inscritas a su nombre corporativo en los registros de la propiedad de Puerto Rico y pagando a El Pueblo de Puerto Rico todas las contribuciones impuestas sobre dichas propiedades, sin que el Gobierno de Puerto Rico haya objetado al negocio de la corporación demandada o a la tenencia y control de más de quinientas cuerdas de tierra hasta que instara el presente procedimiento; y que por razón de su tolerancia y demora en incoar esta acción, el querellante está impedido (*estopped*) de solicitar la cancelación de la franquicia de la corporación demandada.

En el juicio celebrado el 7 de marzo de 1938 el Procurador General de Puerto Rico argumentó en representación del querellante que la contestación de la demandada prácticamente admitía todas las alegaciones esenciales de la que-

rella y que la única contienda de hechos que las alegaciones presentaban era la negación que hacía la demandada de las alegaciones de la querella al efecto de que la tenencia o control por la corporación demandada de fundos tan vastos de tierra es contrario a la ya establecida y frecuentemente anunciada política pública de El Pueblo de Puerto Rico y en conflicto con el bienestar económico del pueblo de la Isla.

En apoyo de sus alegaciones, el querellante ofreció en evidencia: (1) El volumen 33 (partes 1, 2, 3, 5 y 8) del "Congressional Record", conteniendo los debates en relación con la Resolución Conjunta núm. 23 de mayo 1, 1900, con el propósito de establecer la política pública que el Congreso trató de poner en práctica en Puerto Rico por medio de dicha resolución; (2) el trigésimo y trigésimoprimer Informes Anuales del Gobernador de Puerto Rico al Secretario de la Guerra, fechados respectivamente agosto 21, 1930 y septiembre 1, 1931, con el propósito de establecer la política pública de El Pueblo de Puerto Rico relativa a la tenencia y control por corporaciones de grandes extensiones de tierra; (3) el Informe Anual del Secretario del Interior de los Estados Unidos para el año fiscal 1937 (páginas 327 a 330); (4) las opiniones y decisiones de la Corte Suprema de Puerto Rico en los casos de *Compañía Azucarera de la Carolina* v. *Registrador*, 19 D.P.R. 152, *Compañía Azucarera del Toa* v. *Registrador*, 19 D.P.R. 759, *La Isabella Grove, Inc.* v. *Registrador*, 24 D.P.R. 257, *The Porto Rican Leaf Tobacco Co.* v. *Registrador*, 24 D.P.R. 262, y *Baetjer et al.* v. *Registrador*, 48 D.P.R. 647; (5) la resolución de la Comisión de Servicio Público de Puerto Rico en el asunto de la petición radicada por la United Porto Rican Sugar Company solicitando franquicia para apresar, con fines de riego, las aguas del Río Humacao, que aparece en los informes anuales de la Comisión al Gobernador, correspondientes al año 1930-1931, págs. 177-186; (6) la Ley núm. 33 de la Asamblea Legislativa de Puerto Rico, aprobada en julio 22, 1935 ((2) pág. 419); (7) la Ley núm. 47, aprobada en agosto 7, 1935 ((2) pág.

.531); (8) la Ley núm. 45, aprobada en agosto 7, 1935 ((2) pág. 511); la Ley núm. 44, aprobada en agosto 6, 1935 ((2) pág. 509); (9) la Resolución Concurrente de la Asamblea Legislativa de Puerto Rico, aprobada en febrero 13, 1935. Todos estos documentos fueron admitidos con la objeción del abogado de la querellada, cuyas excepciones fueron anotadas.

El querellante ofreció también en evidencia: (a) el censo de Puerto Rico correspondiente al año 1935, hecho por la Administración de Reconstrucción de Puerto Rico (Puerto Rico Reconstruction Administration) y publicado por el Negociado de Imprenta del Gobierno, Washington, 1937; (b) el Informe sobre los Problemas Agrícolas de Puerto Rico (The Agricultural Problems of Puerto Rico), por Rafael Picó, Profesor de la Universidad de Puerto Rico y Consejero de la Administración de Reconstrucción de Puerto Rico, fechado mayo 18, 1936; (c) Informe de Farr & Co., agentes corredores de azúcar; (d) Monografía titulada "Tipos de Explotación Agrícola en Puerto Rico" (Types of Agricultural Exploitation in Puerto Rico), publicada por el Colegio de Agricultura y Artes Mecánicas de la Universidad de Puerto Rico en noviembre de 1935; (e) Tabla núm. 4, pág. 8, Censo de Puerto Rico, 1935, por P.R.R.A.; (f) Informe sobre la Industria Azucarera en relación con el sistema social y económico de Puerto Rico (Report on the Sugar Industry in relation to the social and economic system of Puerto Rico), por Esteban A. Bird, Jefe de la División de Investigaciones Económicas de la Administración de Reconstrucción de Puerto Rico, enero 23, 1937. La admisión de dichos documentos fué debidamente objetada, tomándose excepción por el abogado de la querellada.

Al cerrar el querellante su caso, la querellada presentó una moción para que se archivara la querella. Y habiéndose denegado dicha moción, la querellada sometió su caso sin introducir ninguna evidencia en apoyo de sus defensas especiales.

 No tenemos duda de la admisibilidad o pertinencia de la evidencia introducida por el querellante. Mucha de la evidencia consiste de estadísticas y de historia legislativa, de las cuales la corte puede y debe tomar conocimiento judicial cuando a ella se le llama específicamente su atención. Véanse: Sección 36, párr. 8, Ley de Evidencia de Puerto Rico; *City Bank Farmers' Trust Co.* v. *U. S.,* 74 F. (2d) 692; *Ponce* v. *Roman Catholic Apostolic Church in Puerto Rico,* 210 U. S. 296, 52 L. Ed. 1068; *Monk* v. *Ehret,* 219 P. 452, 192 Cal. 186; *Chicago R. I. & P. Ry. Co.* v. *Gist,* 190 P. 878; 79 Okl. 8; *James* v. *Kuhn,* 8 P. (2d) 526, 121 Cal. App. 69; *Fortinberry* v. *State,* 283 S. W. 146; *Ex Parte Lewis,* 135 So. 147, 101 Fla. 624; *U. S.* v. *Payne,* 264 U. S. 446, 68 L. Ed. 782; *Greene County* v. *Lydy,* 172 S. W. 376, 263 Mo. 77; *Miller* v. *U. S.,* 57 F. (2d) 424; *Fidelity Union Trust Co.* v. *Reeves,* 98 N. J. Eq. 412; *Grimmer* v. *Tenement House Department of the City of New York,* 204 N. Y. 370; *Hill* v. *Rae,* 158 P. 826, 52 Mont. 378, L.R.A. 1917-A 495; *Jasper County Farm Bureau* v. *Jasper County,* 286 S. W. 381, 315 Mo. 560; *Frost* v. *Corporation Commission of Oklahoma,* 26 F. (2d) 508, revocado (1929) 278 U. S. 515, 73 L. Ed. 483; *Sligh* v. *Kirkwood,* 237 U. S. 52, 59 L. Ed. 835; *Tolfree* v. *Wetzler,* 25 F. (2d) 553.

Lo que sigue es un compendio de los hechos históricos, records y estadísticas que se han traído a nuestra atención.

Puerto Rico tiene un área total de 3,435 millas cuadradas, equivalentes a 2,198,400 acres, de los· cuales 1,222,284 son de tierra labrantía. La población de la isla en 1898, cuando Puerto Rico fué cedido a los Estados Unidos, era de 953,243 personas. El área total dedicada al cultivo de caña de azúcar era, en aquel tiempo, de 70,000 acres.

Los debates del Congreso en el año 1900, mientras se discutía la ley para imponer el 25 por ciento de la tarifa de Dinley a todos los productos importados de Puerto Rico a Estados Unidos y viceversa y la Carta Orgánica (Foraker Law), para proveer un gobierno civil para Puerto Rico

(31 Stat. at Large, Chap. 191, p. 77), demuestran la previsión de aquellos miembros del Congreso que expresaron sus temores de que el comercio libre entre Puerto Rico y Estados Unidos haría de la isla un sitio demasiado atractivo para la inversión de grandes capitales en azúcar y en tabaco, con el resultado probable de que quedaría la mayor parte, si no la totalidad de la tierra de labrantío, bajo la propiedad y el control de los *trusts* de azúcar y tabaco. Este temor se intensificó cuando en el año anterior, en 1899, la isla fué devastada por un ciclón, con la consiguiente pérdida de la cosecha, y la depreciación e hipoteca de sus mejores tierras. Para prevenir el desarrollo de un monopolio agrario que se adueñara de y controlara los mejores terrenos de esta pequeña isla tan densamente poblada, y que eventualmente convirtiera a la isla en una enorme fábrica de azúcar operada por un proletariado medio esclavo, y para fomentar el fraccionamiento de la isla en pequeñas parcelas operadas y controladas por sus dueños, el Congreso aprobó la Resolución Conjunta núm. 23, aprobada el primero de mayo de 1900, la sección 3 de la cual lee como sigue:

"Sección 3.—...Ninguna corporación será autorizada para conducir el negocio de compra y venta de bienes inmuebles ni se le permitirá poseer o tener bienes inmuebles excepto aquéllos que sean razonablemente necesarios para llevar a cabo los propósitos para que fué creada, y toda corporación que en adelante se autorizare a dedicarse a la agricultura será restringida por su carta constitutiva à la tenencia y control de terrenos que no excedan de quinientos acres; y se considerará que esta disposición prohibe a cualquier miembro de una corporación dedicada a la agricultura de que se interese en cualquier otra corporación dedicada a la agricultura. Las corporaciones, sin embargo, pueden prestar dinero con garantía de bienes inmuebles, y comprar bienes inmuebles cuando sea necesario para el cobro de préstamos, pero venderán los bienes inmuebles así obtenidos dentro de los cinco años de haber recibido el título a ellos. Las corporaciones que no hayan sido organizadas en Puerto Rico, y haciendo negocios allí, quedarán sujetas a las disposiciones de esta sección en cuanto sean aplicables.''

Desde la Edad Media hasta el presente, los soberanos y los parlamentos han considerado su deber el proteger a sus súbditos y a sus ciudadanos contra los atentados por parte de las grandes combinaciones de capital para monopolizar las tierras propias para el labrantío, que son la base de la riqueza de cualquier comunidad. Son numerosos los estatutos y los precedentes que podrían citarse para sostener la validez y la sabiduría de la legislación aprobada con el propósito de poner en efecto dicha política agraria. Los estatutos de Mortmain en Inglaterra y la legislación española podrían citarse como precedentes. El Congreso de los Estados Unidos, con el propósito de proteger al pueblo de los territorios no incorporados, aprobó leyes prohibiendo la tenencia de tierras por corporaciones en exceso de cinco mil acres, aun cuando algunos de esos territorios tenían un área de 100,000 ó de 200,000 millas cuadradas. Véase 24 Stat. L. 476, 1er. Supp. 2 Rev. Stat. of U. S. 2ed. p. 556, enmendadas por la ley de 9 de marzo de 1888, 25 Stat. L. 45, 1st. Supp., 582. Véase también *McQuaide* v. *Enterprise Brewing Co.*, 14 Cal. App. 315, 111 P. 927; *Commonwealth* v. *Railway Co.*, 132 Pa. St. 591, 19 A. 291; *Ronaldson & P. Co.* v. *Bynum*, 122 La. 687, 48 So. 152; *Jackson* v. *Western Union Tel. Co.*, 269 F. 598; *Shelby* v. *Hummel*, 266 U. S. 633, 69 L. Ed., 479; *Commonwealth* v. *N. Y. L. R. & W. R. Co.*, 114 Pa. St. 340, 7 A. 756; *Late Corporation of the Church, etc.* v. *U. S.*, 136 U. S. 1, 34 L. Ed. 481; *Trustees of the Catholic Church* v. *Manning*, 72 Md. 116, 19 A. 599; *House of Mercy* v. *Davidson*, 90 Tex. 529, 39 S. W. 924; *In re Hood Realty Co.*, 2 F. (2d) 344 (*sic*); *In re McGraw Estate*, 11 N. Y. 66, confirmado en 136 U. S. 152; Washburn on Real Property, 6a. ed., secciones 134 y 135; 4 Thompson on Corporations, 3a. ed., secciones 2451 y 2475; Tiffany on Real Property, sección 504.

En el año 1917, el tema de la limitación sobre la tenencia de tierras que pueden ser legalmente poseídas o controladas por corporaciones en Puerto Rico se trajo otra vez a debate por el Congreso federal. Se reafirmó la prohibición y se

incorporó en la nueva Acta Orgánica, conocida por Ley Jones, en la forma que sigue:

"Sec. 39. . . . . . . . .

"Nada de lo contenido en esta Ley será interpretado en el sentido de revocar o en alguna forma menoscabar o afectar la disposición contenida en la Sección 3 de la Resolución Conjunta aprobada en 1 de mayo de 1900, con respecto a la compra, venta o posesión de bienes inmuebles. El Gobernador de Puerto Rico dispondrá que se tenga preparado y se someta al Congreso en la legislatura que principiará el primer lunes de diciembre de 1917, un informe de todos los bienes inmuebles usados para fines agrícolas y poseídos, bien directa o indirectamente, por corporaciones, sociedades o individuos, en cantidades que excedan de quinientos acres."

La sabiduría y la previsión de los patrocinadores de la política agraria insular englobada en la antes mencionada legislación federal, han sido demostradas por acontecimientos posteriores. Puerto Rico, que atrajo la atención del Congreso en 1900 por la densidad de su población, desde entonces ha casi duplicado el número de sus habitantes, el censo de 1935 llevado a cabo por la Administración de Reconstrucción de Puerto Rico, una agencia federal, demostrando que la isla tenía en esa fecha una población de 1,723,534 habitantes, o sea un promedio de 501 personas por milla cuadrada; que 72.3 por ciento de esta población vive en la zona rural y depende enteramente de la actividad agrícola para su subsistencia; que la isla tiene como promedio algo menos de un acre cuadrado de tierra de labrantío por habitante de la zona rural; que 251,000 acres, o sea una quinta parte de toda la tierra propia para la agricultura, se emplean para la producción de caña de azúcar; que no menos de 196,757 acres, o sea un poco menos del 70 por ciento del área total sembrada para la producción de caña de azúcar, es de la propiedad de, o está controlada por, compañías que a su vez están controladas casi exclusivamente por accionistas ausentes; que las compañías así organizadas y controladas manufacturan, normalmente, el 59 por ciento del total del azúcar producido por la Isla, controlando por tanto casi el 40 por

ciento del total de la riqueza agrícola insular, y que durante la década de 1920 a 1930 el número de acres combinados de todos los fundos administrados por sus dueños decreció en 318,232 acres, mientras que el número total de acres operados por administraciones extrañas aumentó en 325,425 acres.

Esta corte necesariamente tiene que tomar conocimiento judicial de los hechos antedichos, que constituyen elementos del problema más intrincado que confronta el pueblo de esta isla. Y tenemos que convenir con el abogado del querellante en que la existencia de grandes fundos de terreno en un pequeño país agrícola, anormalmente sobrepoblado y sin otras industrias básicas que aquéllas necesarias para la preparación de los productos agrícolas para el mercado, es contraria al bienestar económico de sus habitantes.

En el año 1935, la Asamblea Legislativa de Puerto Rico, inspirada por el deseo de cooperar con la Administración Nacional en el desarrollo de sus planes para la reconstrucción económica de la isla, aprobó varios estatutos, el propósito común de los cuales es proveer las medidas remediales necesarias para poner coto a los monopolios de tierras existentes y prevenir que se continúe violando las disposiciones del Acta Orgánica, supra. Dichos estatutos son los siguientes:

1. Ley núm. 33, aprobada en 22 de julio de 1935, que confiere a la Corte Suprema de Puerto Rico jurisdicción original exclusiva para conocer de todo procedimiento de quo warranto por violación de las disposiciones de la sección 752 del Título 48 U.S.C.A., y provee que la violación de dichas disposiciones constituirá motivo bastante para que se inicie un procedimiento de la naturaleza del quo warranto. (Leyes de 1935, sesión especial, pág. 419.)

2. Ley núm. 44, aprobada el 6 de agosto de 1935, que dispone que la propiedad privada podrá ocuparse o destruirse

"para llevar a cabo y desarrollar cualquier plan general de reconstrucción económica en beneficio general de la comunidad insular, puesto en práctica por el Pueblo de Puerto Rico o por el Gobierno

de los Estados Unidos...y especialmente para la redistribución o fraccionamiento de tierras concentradas en latifundios, o el establecimiento de centrales o factorías públicas para la fabricación de azúcar o cualquiera industria o actividad.'' (Leyes de 1935, sesión especial, pág. 509.)

3. Ley núm. 47, aprobada el 7 de agosto de 1935. Sus disposiciones pertinentes leen como sigue:

''Sección 1.—Que la sección 2 de la 'Ley estableciendo los procedimientos de *quo warranto,* aprobada en 1ro. de marzo de 1902', queda por la presente enmendada en la forma siguiente:

'' 'Sección 2.—...; o cuando cualquier corporación, por sí, o a través de cualquier otra entidad subsidiaria o afiliada o agente, ejercite derechos o realice actos o contratos en contravención a las expresas disposiciones de la Carta Orgánica de Puerto Rico o de cualquiera de sus estatutos, el Fiscal General o cualquier fiscal de distrito, ya obrando por su propia iniciativa, ya a instancias de otra persona, podrá radicar ante el Tribunal Supremo de Puerto Rico una solicitud para que se instruya información de la naturaleza del *quo warranto* a nombre de El Pueblo de Puerto Rico; y si a juicio de la corte ante la cual se radicare el asunto resultare de las alegaciones que existe probable fundamento para instruir las diligencias del caso, podrá acceder a la petición y ordenar que se instruya información de acuerdo con la solicitud. Cuando a juicio de la corte los distintos derechos que varias personas tengan sobre un mismo cargo o franquicia puedan determinarse claramente en el mismo procedimiento, podrá conceder permiso para incluir a todas dichas personas en la misma petición, con el objeto de determinar sus respectivos derechos a tal cargo o franquicia.

'' 'Cuando cualquier corporación por sí o a través de cualquier otra entidad subsidiaria o afiliada o agente esté poseyendo ilegalmente, por cualquier título bienes inmuebles en Puerto Rico, El Pueblo de Puerto Rico podrá, a su opción, dentro del propio procedimiento, instar la confiscación de dichos bienes, a su favor, o su enajenación en subasta pública dentro de un término no mayor de seis meses a contar desde la fecha en que se dicte sentencia final.

'' 'En todo caso la enajenación o confiscación se hará previa la indemnización correspondiente en la forma establecida en la Ley de Expropiación Forzosa.'

''Sección 2.—La sección 6 de la referida Ley estableciendo los procedimientos de 'quo warranto', aprobada en 1ro. de marzo de 1902, queda por la presente enmendada del modo siguiente:

" 'Sección 6.— . . . . . .

" 'En todos los casos en que quedare satisfactoriamente probado, a juicio de la corte, que la corporación o corporaciones han realizado actos o ejercitado derechos no conferidos por la ley, o en contravención a las expresas disposiciones de la misma, en la sentencia que recaiga, se decretará la disolución de la entidad demandada, si fuere doméstica, la prohibición de continuar haciendo negocios en el país, si fuere extranjera, la nulidad de todos los actos y contratos realizados por la corporación o entidad demandada, y se decretará, además, la cancelación de los asientos o inscripciones que los mismos hayan producido en los registros públicos de Puerto Rico, y cuando el decreto de nulidad afecte a bienes inmuebles y El Pueblo de Puerto Rico hubiere optado por su confiscación, o se ordenare la venta en pública subasta, la sentencia final fijará el precio razonable que deba pagarse por los mismos. A estos efectos deberá fijarse el justo valor de los bienes sujetos a enajenación o confiscación en la misma forma fijada en los casos de expropiación forzosa.

" ' . . . . . . ' ''

(Leyes de 1935, sesión extraordinaria, p. 531.)

La demandada insiste dentro de estos procedimientos que la Resolución Conjunta núm. 23, de 1ro. de mayo de 1900, es nula porque contiene un discrimen arbitrario en contra de las corporaciones agrícolas; que la Asamblea Legislativa de Puerto Rico no tiene poder para conferir a esta Corte Suprema jurisdicción original exclusiva en procedimientos de *quo warranto* basados en violaciones a las leyes limitando la cantidad de tierras tenidas por corporaciones, correspondiendo tal jurisdicción exclusivamente a la Corte Federal de Puerto Rico; y que la querella no expone hechos suficientes constitutivos de causa de acción en contra de la corporación querellada. Se hace innecesaria una discusión más amplia de dichas cuestiones. Las mismas fueron levantadas, plenamente discutidas y decididas en contra de las corporaciones en *El Pueblo de Puerto Rico* v. *The Fajardo Sugar Company of Porto Rico et als.*, (*Quo Warranto* núm. 1), 50 D.P.R. 163, y 51 D.P.R. 876.

Si hubiésemos tenido dudas sobre el poder de la Legislatura de Puerto Rico para aprobar las leyes números 33, 44

y 47, supra, dichas dudas hubieran sido desvanecidas por la decisión unánime rendida por la Corte Suprema de los Estados Unidos en el caso de *Pueblo* v. *The Shell Company (P.R.) Ltd. et al.*, 302 U. S. 253, 260, en que la cuestión envuelta era la validez de la ley local contra los *trusts,* que por su sección tercera confería jurisdicción a las cortes de distrito de la isla sobre violaciones a esa ley. Se alegaba por la compañía demandada que la ley Sherman contra los *trusts,* complementada por la Ley Clayton de 1914, cubría toda la materia que abarcaba la ley local contra los *trusts,* y que, por lo tanto, esta última era nula; y que la sección 4 de la Ley Sherman confería jurisdicción a las diferentes cortes de distrito de los Estados Unidos. Manteniendo la validez del estatuto local, dijo la Corte Suprema de los Estados Unidos por medio de su Juez Asociado, Sr. Sutherland:

"1. El artículo 14 de la Ley Foraker, aprobada el 12 de abril de 1900, c. 191, 31 Stat. 77, 80, disponía que las leyes estatutarias de los Estados Unidos que no fuesen localmente inaplicables, tendrían el mismo efecto y validez en Puerto Rico que en los Estados Unidos, con algunas excepciones que son irrelevantes a este caso. El artículo 27 (pág. 82) disponía que 'todos los poderes legislativos locales concedidos en esta ley residirán en una Asamblea Legislativa...' Y en el artículo 32 (pág. 83–84) se disponía que la autoridad legislativa 'se aplicará a todos los asuntos de carácter legislativo que no sean localmente inaplicables. . .' Estas diversas disposiciones se mantienen en vigor por los artículos 9, 25 y 37 del Acta Orgánica de marzo 2 de 1917, c. 145, 39 Stat. 951. Estas disposiciones no difieren sustancialmente de las diversas disposiciones referentes a los poderes de los territorios continentales organizados e incorporados de los Estados Unidos, con respecto a los cuales esta corte dijo en *Clinton* v. *Englebrecht,* 13 Wall. 434, 441, que la teoría bajo la cual estos territorios habían sido organizados 'siempre ha sido la de conceder a los habitantes todos los poderes de gobierno propio que fuesen consistentes con la supremacía y la supervisión de la autoridad nacional y con ciertos principios fundamentales establecidos por el Congreso'; y en *Hornbuckle* v. *Toombs,* 18 Wall. 648, 655–656, dijimos 'Los poderes así ejercitados por las legislaturas territoriales son casi tan amplios como aquéllos ejercitados por cualquier legis-

latura estadual.' Véase también *Cope* v. *Cope,* 137 U. S. 682, 684, donde esta corte, al hablar de esta disposición general típica contenida en el Acta Orgánica de Utah, dijo que con las excepciones mencionadas en la propia disposición, 'el poder de la legislatura territorial era aparentemente tan pleno como el de la legislatura de un Estado.' En *Maynard* v. *Hill,* 125 U. S. 190, 204, fué señalada la similaridad esencial de las diversas disposiciones con respecto a los poderes de legislaturas territoriales, y se dijo que lo que era 'materia apropiada de legislación' se determinaría 'por un examen de las materias sobre las cuales las legislaturas han estado en el hábito de actuar con el consentimiento y aprobación del pueblo que ellas representan.'

"La concesión de poder legislativo con respecto a materias locales, contenido en el artículo 32 del Acta Foraker y continuada en vigor por el artículo 37 del Acta Orgánica de 1917 es tan amplia y comprensiva como el lenguaje usado pudiese ser capaz de hacerlo. La cuestión primordial que surge de la impugnación a la validez de la ley que estamos considerando es al efecto de si la materia cubierta por la ley es una 'de un carácter legislativo que no sea localmente inaplicable'. No es necesario argumentar para demostrar que una conspiración con el propósito de restringir el comercio dentro de los límites territoriales de Puerto Rico es claramente una materia local y que ella cae bajo los términos precisos del poder concedido por los artículos 32 y 37 de las leyes respectivas en las cuales se encuentra la concesión. Habiendo sido otorgado el poder sin limitación expresa, una conclusión al efecto de que el actual ejercicio del poder está prohibido por la existencia del artículo 3 de la Ley Sherman, debe descansar sobre la asunción de que un estatuto congresional en el que se penaliza cierta conducta local específica y un estatuto de Puerto Rico al mismo efecto no pueden coexistir. Prestando debida atención al *status* del territorio, al carácter de su gobierno establecido, a los términos positivos de la concesión congresional de poderes y a la ausencia de conflicto entre ambas leyes, dicha asunción debe ser rechazada.

"2. El propósito de la Ley Foraker y de la Ley Orgánica era el de concederle a Puerto Rico plenos poderes de propia determinación local, con una autonomía similar a aquellos estados y de los territorios incorporados. *Gromer* v. *Standard Dredging Co.,* 224 U. S. 362, 370; *Porto Rico* v. *Rosaly,* supra, pág. 274. El efecto fué el de conferirle al territorio muchos de los atributos de cuasi-soberanía disfrutados por los estados, por ejemplo, inmunidad de acciones sin su consentimiento. *Porto Rico* v. *Rosaly,* supra. A

virtud de estas leyes fué erigida la típica estructura gubernamental americana, consistente de los tres departamentos independientes— legislativo, ejecutivo y judicial. 'Un cuerpo político'—una comunidad—fué creada. 31 Stat. 79, sec. 7, c. 191. El poder de imponer contribuciones, el poder de enactar y ejecutar leyes y otros poderes gubernamentales característicos fueron concedidos. Y en lo que se refiere a materias locales, como ya hemos demostrado con respecto a territorios continentales, los poderes legislativos fueron conferidos, casi, si no simplemente, tan amplios como los ejercitados por las legislaturas estaduales.

''Esta amplia concesión de poder legislativo hecha por el Congreso reconoce claramente la gran conveniencia de depositar en el gobierno local la responsabilidad de investigar ofensas locales y per-. seguirlas en los tribunales locales. La Corte Suprema insular. en este caso se expresó en términos enfáticos sobre la sabiduría de tal control local con respecto a la materia cubierta por la ley que estamos considerando. Aunque con evidente repugnancia, echando abajo la ley por ser inválida, dicha corte dijo: 'El derecho de la legislatura y de las autoridades insulares a perseguir y castigar los monopolios que se cometen dentro de nuestra jurisdicción es realmente inapreciable. Así lo entendió nuestra Asamblea Legislativa cuando se permitió legislar sobre la materia. Es ésta una legislación saludable y necesaria que debiera hacerse efectiva a través de los tribunales insulares. Hay que convenir en que El Pueblo de Puerto Rico tiene un interés especial en llevar a los tribunales a los ciudadanos que violen sus propias leyes. Por mucho interés que pueda tener el Gobierno Nacional para perseguir esos delitos, puede darse el caso de que pasen inadvertidos para las autoridades federales o que por una circunstancia u otra no se despliegue la misma actividad y el mismo interés que debe esperarse de las autoridades locales.' ''

No debería ser necesario el presentar argumentos para demostrar que la monopolización de tierras agrícolas dentro de las fronteras de Puerto Rico es también una materia claramente local que cae dentro de los términos precisos de los poderes concedidos por el artículo 32 de la Ley Foraker y por el artículo 37 del Acta Orgánica de marzo 2 de 1917.

La demandada es una corporación autorizada a dedicarse a la agricultura y expresamente restringida por su carta constitutiva al dominio y control de no más de 500 acres de

terreno. Ella ha admitido por sus propias alegaciones que ella es dueña de y controla 12,188 acres de terreno la mayor parte de los cuales se dedican al cultivo de caña de azúcar. Estamos convencidos que el querellante ha presentado un caso que le da derecho al remedio solicitado en su querella. Nuestra convicción no se debilita en lo más mínimo por ninguna de las dos defensas específicas levantadas por la demandada.

■ El hecho de que a la corporación demandada también se le autoriza por sus artículos de incorporación a dedicarse a la industria de manufacturar azúcar, no puede librar a dicha corporación de las restricciones impuestas sobre ella por el Acta Orgánica y por sus propios artículos de incorporación (artículo 4, pár. (f), supra), cuando ella se dedica a la agricultura. Los fines y propósitos de la ley no pueden ser tan fácilmente evadidos y derrotados. El sostener tal defensa le haría posible a una corporación, a pesar de las disposiciones del Acta Orgánica y de sus propios artículos de incorporación, el ser dueña de, controlar y monopolizar todos los terrenos de Puerto Rico dedicados al azúcar, mediante la sencilla alegación de que ella se dedica a la manufactura de azúcar como su negocio principal y que necesita todos dichos terrenos para plantar, cultivar y producir toda la caña que necesita para su central, estando ésta equipada para producir más de un millón de toneladas de azúcar.

■■ De mucho menos fuerza es la alegación de que El Pueblo de Puerto Rico está impedido de reclamar actualmente la disolución de la franquicia corporativa de la demandada debido a la aquiescencia del Gobierno y a su tardanza en exigir que cumpliese con la ley. La infracción continuada del estatuto prohibitorio durante cierto número de años no puede ser invocada por el infractor como base o fuente de su supuesto derecho a continuar *ad perpetuam* en el dominio y control de terrenos en exceso de la cantidad permitida por el estatuto. El permitir tales alegaciones, le haría posible al dueño de una casa de juegos o de una casa de

prostitución el alegar inmunidad de persecución y el disfrutar del derecho de continuar en tal negocio ilegal al probar su operación durante determinado número de años sin haber mediado intervención alguna de las autoridades policiacas.

El peso arrollador de las autoridades favorece la proposición que un estatuto no puede ser derogado por no uso a menos que a tal no uso se acompañe la aprobación de estatutos irreconciliables o el establecimiento de una política legislativa opuesta o a menos que las circunstancias hayan variado de tal manera que el objeto del estatuto haya desaparecido o su razón de existir haya cesado. 39 Cyc. pág. 1085, párr. F; 59 C. J. sec 532, pág. 928; *Pearson* v. *International Distillery et al.,* 34 N. W. (Iowa) 1, confirmado en 128 U. S. 1. En *Gulf Refining Co.* v. *City of Dallas,* 10 S. W. (2d) 151, 158, se dijo:

" ....A juicio nuestro la doctrina de 'ley obsoleta', tal como es aplicada en varias ocasiones al derecho común, nunca ha sido reconocida por ninguna de las cortes de este país como aplicable a una disposición legislativa ni, ciertamente, a una disposición constitucional.''

En *Interstate Forwarding Co.* v. *Vineyard,* 3 S. W. (2d) 947, 957, la alegación de "no uso" fué desestimada usando la Corte de Apelaciones Civiles de Texas el siguiente lenguaje:

" ....En su último análisis, la posición del apelante es que si a un funcionario a quien se le ha impuesto el deber de hacer efectiva determinada ley deja de hacerla efectiva contra todas las personas obligadas a observar sus disposiciones, el funcionario de esa manera ha suspendido la ley. No podemos estar conformes con dicha posición. Descansa tanto el deber sobre el ciudadano para observar los mandatos claros de la ley como descansa sobre el funcionario encargado de hacer efectivos sus términos y disposiciones, la obligación de desempeñar tal deber y la validez de un estatuto no puede ser menoscabada de esa manera y solamente se puede intervenir con su ejecución. En otras palabras, la ley permanece en toda su fuerza y vigor aunque, por decirlo así, en un estado latente debido a su no ejecución. Esto es consistente con las siguientes reglas de interpretación estatutaria:''

La Corte Suprema de los Estados Unidos, en *Chicago, etc. R. R. Co.* v. *Iowa,* 94 U. S. 155, 162, dijo:

"Carece de importancia el hecho de que el poder de reglamentación que estamos ahora considerando no fué ejercitado por más de 20 años después que esta compañía fué organizada. Un poder gubernamental que existe en la actualidad no se pierde a través del no uso. Un buen gobierno nunca ejerce sus poderes extraordinarios excepto bajo circunstancias que así lo requieran."

Y en *Louisville & N. R. Co.* v. *U. S.,* 282 U. S. 740, 759, la misma corte dijo:

"La práctica continuada por largo espacio de tiempo y la aprobación de autoridades administrativas pueden ser persuasivas en la interpretación de disposiciones dudosas de un estatuto, pero no pueden alterar disposiciones que son. claras y explícitas al referirse a los hechos del caso. *El dejar de hacer efectiva una ley no la altera.* La buena fe de los porteadores en · las transacciones del pasado puede ser incuestionable pero ello no justifica la continuación de la práctica." (Itálicas nuestras.)

Véase: *Standard Oil Co.* v. *Fitzgerald,* 86 F. (2d) 799; *State* v. *Burr,* 84 So. 61, 74; *State* v. *Meek,* 67 P. 76; *State* v. *Nease,* 80 P. 897; y *Parker* v. *Board of Dental Examiners,* 14 P. (2d) 67, en el que se resolvió:

". . . .La acción retardada de parte de aquéllos que están encargados de hacer efectivas las leyes no puede tener el efecto de anular la ley. Puede ser considerado por la corte como una razón para mitigar la pena, pero el departamento judicial no está obligado absolutamente a considerarlo."

Es cierto que El Pueblo de Puerto Rico hasta ahora no había tomado ninguna acción directa y positiva para hacer efectivas las limitaciones de la Resolución Conjunta de marzo 1, 1900. Pero también es cierto que las disposiciones de dicha Resolución Conjunta fueron promulgadas de nuevo y hechas parte de la Ley Orgánica de 1917, cuya acción es, a nuestro juicio, una expresión clara de la voluntad del Congreso de continuar en efecto y de mantener viva la política legislativa que disponía una limitación de la tenencia de tierras por

corporaciones que se dedicasen a la agricultura en Puerto Rico. Nuestra atención no se ha llamado a la aprobación, ya sea por el Congreso o por la Legislatura local, de estatuto alguno que establezca una política legislativa distinta e irreconciliable. Por el contrario, la intención y propósito claro y evidente de las leyes números 33, 44 y 47 de 1935, supra, fueron el de establecer los medios procesales para hacer efectivas las restricciones sobre la tenencia de tierras y esta Corte Suprema en todas sus decisiones, dictadas en recursos gubernativos contra las negativas de un registrador a inscribir escrituras de compra en favor de corporaciones, que envolvían más de 500 acres de terrenos, resolvió consistentemente que no era una de las funciones de los registradores al pasar sobre la validez de tales adquisiciones, sugiriendo mientras tanto que el remedio apropiado debería ser el de una acción directa y positiva por el Estado en contra de la corporación infractora, con el objeto de poner a prueba su derecho a tener tales terrenos en violación del estatuto y con el objeto de cancelar su carta constitutiva.

Por las razones que anteceden es nuestra opinión que debe dictarse sentencia en favor del querellante y en contra de la demandada en este caso, con los siguientes pronunciamientos:

1. Declarando y resolviendo que la corporación demandada, Rubert Hermanos, Inc., está dedicada a la agricultura y es culpable de poseer como dueña y controlar 12,188 acres de tierra en violación de las disposiciones de la Resolución Conjunta núm. 23 del Congreso de los Estados Unidos (31 Statutes at Large 716, U.S.C.A., Título 48, sec. 752), de la sección 39 de la Ley Orgánica de Puerto Rico y de sus propias cláusulas de incorporación, por todas las cuales disposiciones dicha corporación demandada está expresamente limitada y restringida a la posesión y control de tierras que no excedan de 500 acres.

2. Ordenando y decretando la caducidad y cancelación de la licencia de la corporación demandada y de sus cláusulas

de incorporación; y ordenando y decretando además la inmediata disolución de dicha corporación y la liquidación de sus negocios.

3. Imponiendo a la corporación demandada el pago de las costas y desembolsos de este procedimiento, incluyendo la suma de $2,000 como honorarios de abogado.

4. Sentenciando a dicha demandada al pago de una multa en la suma de solamente tres mil dólares, dicha suma habiendo sido fijada tomando en consideración la tardanza de parte del querellante en instituir estos procedimientos.

El Juez Asociado Sr. Wolf está conforme con muchas partes de la opinión y con el primer pronunciamiento de la sentencia. En cuanto a algunos de los otros pronunciamientos tiene algunas dudas sobre el poder de la corte, que quizás puedan disiparse después de un estudio más detenido, dudando también de que aun teniendo la corte el poder, deba ejercitarlo en la forma en que lo ha hecho, reservándose expresar con mayor amplitud su criterio.

El Juez Asociado Sr. De Jesús no tomó parte en la decisión de este caso.